117 142
118 650
119 181
——
117 142
120 40
120 147

117 142
f121 368

117 142
s75NW 445
133 1486

117 142
135 6232

117 142
156 6395
d156 6396

BURNHAM *v.* INTERSTATE CASUALTY CO.[1]

1. EVIDENCE—CAUSE OF DEATH—PRESUMPTION.
   Where death may be attributable either to suicide or accident, the presumption of law is against suicide.

2. SAME—DEATH IN WATER.
   The fact that the body of a person, who was seen struggling in the water, did not sink, as is usual in cases of drowning, is not conclusive that the cause of death was apoplexy or sudden seizure, rather than drowning. So *held,* at least, where there was evidence tending to show a condition—*i. e.,* the distension of the abdomen by gases—which, in the opinion of experts, accounted for the phenomenon.

3. SAME.
   Assuming that some sudden seizure caused deceased to fall into the water, or came upon him after he had accidentally fallen, it does not necessarily follow that his death was not caused by drowning.

4. SAME—ACCIDENTAL DROWNING—QUESTION FOR JURY.
   Deceased, insolvent and heavily insured, in the afternoon of the day on which he made his will, rented a boat and started to row across the river. Nothing unusual had been noticed in his appearance or conduct. He was seen to fall into the water, to swim towards his boat, and to call for assistance. When reached, he was dead, and his body was floating, face downward. His boat had taken in no water. The body bore symptoms of drowning, and the abdomen was dilated with gases. *Held,* that a finding that deceased was accidentally drowned was justified.

5. INSURANCE—GARNISHMENT OF COMPANY—SPECIAL INTERROGATORIES—TIME FOR FILING ANSWER.
   An insurance company, when garnished by the creditors of a beneficiary, has a right to wait until the expiration of the time allowed it by the terms of the policy for examining and determining as to the validity of claims, before answering special interrogatories with respect to its grounds for denying liability upon the policy. Per GRANT, C. J.

6. SAME—BREACH OF WARRANTY—WAIVER.
   An insurance company which furnishes to a beneficiary,

[1] Rehearing denied June 28, 1898.

upon request, blanks for proofs of death, the preparation of which entails expense to the beneficiary, with merely a general statement that the furnishing of the same shall not be deemed a waiver of any of the agreements or conditions of the policy, will be held to have waived the right to insist upon a defense growing out of a breach of warranty on the part of the insured of which it had knowledge at the time the blanks were furnished; and the question is in no way affected by the fact that its information as to the breach was acquired from others than the beneficiary. GRANT, C. J., and HOOKER, J., dissenting.

Error to Wayne; Carpenter, J. Submitted January 7, 1898. Decided May 18, 1898.

Garnishment proceedings by James K. Burnham and others against the Interstate Casualty Company of New York, as garnishee of Eva Winans. From a judgment for plaintiffs, the garnishee defendant brings error. Affirmed.

The appellant is garnishee of the principal defendant in several suits that were consolidated and tried as one. The suits were commenced August 29, 1896. Plaintiffs' claim rests on an accident policy issued by appellant on the application of W. N. Winans, the husband of the principal defendant. The policy, among other things, provided, in case of his death by "external, violent, and accidental means," for the payment to his wife of $5,000. The insured had been manager of his wife's dry-goods business, carried on under the name of Winans & Co. It was closed under chattel mortgages aggregating $57,176.02, and covering property estimated by the insured to be worth $80,000. The fire-insurance companies had canceled their policies upon the stock. The mortgages covered the homestead, household furniture, and fixtures of Mrs. Winans. Mr. Winans had been arrested on a *capias*, and was in the custody of his bail. He had $85,000 of insurance (life and accident) in various companies, all of which were payable either to his son or his

wife, except the last, which was for $5,000, and was payable to his brother.   The first of these policies was taken out in 1889, another in 1892, and the rest in 1895 and 1896.   The last one was an accident insurance for $5,000, and was issued August 1, 1896.   The application for the policy issued by the defendant company contained the following: "I have no accident insurance, except as herein stated; and I hereby agree to notify the company of any hereafter applied for or obtained."   The policy expressly stated that it was issued "in consideration of the warranties in the application."   No notice of the subsequent policy was given by the insured, and the defendant had no information in regard to it until after the death of Mr. Winans.   Mr. Winans made his will August 24, 1896, and in the afternoon of that day rented a rowboat, and started to row across the Detroit river.   He was seen to fall into the water; to be swimming towards his boat, and crying out for assistance.   Some parties, seeing and hearing him, took a boat, and rowed to his assistance.   When they reached him, he was dead, and the body was floating in the water, with the face downward.   The defendant denied liability under its policy.   Issue was duly joined, and plaintiffs had verdict and judgment.

*James C. Smith, Jr.* ( *Otto Kirchner,* of counsel), for appellant.

*Elliott G. Stevenson* and *John D. Conely,* for appellees.

GRANT, C. J. ( *after stating the facts* ).   Two reasons are urged against the judgment: (1) That there was no evidence that Mr. Winans came to his death by external, violent, and accidental means; (2) that there was a breach of warranty in applying for and obtaining the subsequent insurance in the Standard Company without notice to the defendant.

1. Upon the first point the learned counsel state their contention as follows:

"There is no direct evidence of accidental drowning. The undisputed physical facts tell their own story. They say, as we shall presently show, that Mr. Winans *may* have drowned accidentally; that he *may* have died of apoplexy; that he *may* have drowned intentionally. Is it possible that a jury is permitted to guess which of the three admissible hypotheses is true?"

They insist that the case falls within the rule in *Merrett* v. *Accident Association*, 98 Mich. 338. No question is raised upon the instructions to the jury, provided there was a question for their determination. The statement of the plaintiffs' proofs is therefore essential.

There is no evidence of anything unusual in the appearance or conduct of Mr. Winans prior to his death. On his way to the boathouse, he met a friend, who invited him to accompany him to the Windsor races. He declined, but said he was going to take a boat ride, and invited his friend to go with him, saying: "I will get some cigars. We will get a boat, and have a real nice, pleasant time."

One Heron was driving over the Belle Isle bridge. He saw Mr. Winans in the boat, and his hat in the water.

"Saw him row around to get his hat. He came alongside of it. When he came alongside of the hat, he got over. Saw him fall into the water, and he hollered for help.   *   *   *   He came · up that far [indicating by a gesture] out of the water."

On cross-examination he testified as follows:

"I was just about a quarter of the way over—a little better—when I first saw the man in the water. He was shouting for help. I was pretty near the end of the bridge, and going slow, to watch him all the while. When I last saw him he was in the water, trying to save himself,— trying to get aboard; and the boat went down sideways, and she kept floating away from him. He tried to get to the boat. I walked my horses, and stopped occasionally. Drove nearly three-quarters of the length of the bridge, looking at him all the time, not stopping any length of time, only going slow several times. When I was about three-quarters across the bridge, the man just disappeared

under the water. I saw him sink once; did not see him come up again."

One Kirk testified that he was on the bridge.

"Saw the ferryboat coming out of the Belle Isle dock, and a man in a small boat. The boat and the man disappeared all at once. I then saw the rowboat going down the river empty. In a little while, saw the man in the water crying for help. Heard him holler three times. Did not see him make any exertion or effort, only he was hollering for help. Saw his hands like that."

One Schultz was at the boathouse. Saw Winans get a boat and start out. Heard the ferryboat give three sharp whistles, meaning to get out of the way.

"Winans was then just where the ferryboat has to go through a small cut on what is called the 'Middle Ground.' I watched him when the ferryboat passed him, and could see that he was 50 or 60 feet above the ferryboat."

After this he paid no more attention. On cross-examination he testified that, "when the ferryboat gave three whistles, Winans struck off up right at the edge of the Middle Ground."

One King testified:

"Saw Mr. Winans swimming towards the boat, struggling in the water. * * * Did not see him throw his hands up in the air, or anything of that kind. The kind of struggling he was doing was, it seemed as if he was swimming very fast. He swam after the boat. The boat kept getting away from him."

One Matzen, who was with King, testified that he thought he noticed him swimming towards the boat. These last two witnesses were the ones who rowed out, and towed the body ashore. They found the body floating, with the top of its head above the water.

One Fritz testified that he saw the man out in the river. Saw the boat floating away, and two objects floating down the river. Heard the man hollering. Heard him plainly two or three times. Did not hear what he said. He was swimming towards the boat,

which was empty. Saw him hold both his hands up twice. The waves seemed to go over him. He was right in behind a ferryboat when he first noticed him,—perhaps 50 feet from the ferryboat.

One Benoit testified that he saw the man in the water. Heard him holler three times. Saw him swimming and struggling for all he was worth. He was sure he was swimming 20 minutes. He looked as if he was swimming for life.

One Baroski testified that he "saw the man throw up both hands twice, and he hollered three times. He was swimming towards his boat all the time after he got up and came from under the water. Raised both his hands twice, went down, and, when he came up, swam again."

Dr. Newman examined the body shortly after it reached the shore. He testified that:

"It presented the ordinary symptoms of a man who died by suffocation. His face was congested. The usual bloody froth and mucous from his lips and nostrils.  *
*   *  He had all the appearance of a man who had been drowned.   *   *   *  If it was an actual fact that he had been swimming, I should say he died from ordinary drowning.   *   *   *  The opinion as to his death, I should think, would depend a great deal upon the fact as to whether he was actually swimming.   *   *   *  Assuming that he was swimming towards the boat, screaming for help, and from what I saw of his condition on the dock, I should say that he died, in all probability, from drowning."

In reply to a question stating substantially the facts, the witness said, upon cross-examination, "It is possible that Mr. Winans died from apoplexy, or a fit, or from suffocation."

Dr. McGraw, another prominent physician, testified, in reply to a question assuming to state all the facts, that he died from drowning, or some sudden seizure, like apoplexy. He also testified that "a man whose abdomen was distended by gases would be liable to float." Dr. Newman had testified that the abdomen was unusually dilated with gases. He also testified that a man taken

with apoplexy while in the water would not have much chance to escape, and might die from drowning, notwithstanding he had apoplexy.

The testimony of these physicians is not conclusive, and its sole province was to aid the jury in their deliberations. Much stress is laid by counsel for the defendant upon the fact that the boat took in no water when Mr. Winans fell overboard.    He might have been reaching for his hat when upon the top or side of a wave, in which event the boat might have righted itself without taking water. We think this circumstance of but little moment.

The learned counsel for the defendant insist that the facts deducible from the above testimony are consistent with three theories of the cause of death, and therefore prove no one of them.    These theories are apoplexy, sudden seizure, and suicide.    We cannot agree in this conclusion.    The testimony does not establish facts to overcome the presumption.    Where death may be attributable to suicide, murder, accident, or negligence, the presumption of law is against suicide and murder.   ·4 Joyce, Ins. § 3773; Nibl. Acc. Ins. § 377; *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661; *Mallory* v. *Insurance Co.*, 47 N. Y. 52 (7 Am. Rep. 410).    It is true that the bodies of persons who die from drowning usually sink, but there are occasional circumstances under which they do not sink, and there was evidence in this case tending to show the presence of those circumstances.    There was no autopsy, but there is no evidence tending to show that Mr. Winans was subject to any fits or sudden seizures.    All the circumstances are consistent with accidental drowning, except the mere fact that the body did not sink.    If, however, it be assumed that some sudden seizure caused him to fall into the water, or came upon him after he had fallen into the water, it would not follow that death was not caused by drowning.

H. left his lodgings about 7 o'clock in the evening, intending to bathe.    His clothes were found on the steps of a bathing machine, and about six weeks afterwards a

body was washed ashore, claimed to be his.   There was no other evidence of the circumstances of his death.   The questions submitted for decision are stated as follows: (1) Assuming H. to have been drowned, and that his death was not caused by suicide, or by his willful act in exposing himself to unnecessary danger, or while he was in a state of intoxication, are plaintiffs entitled to recover? (2) Was there any evidence, proper to be submitted to the jury, that H. was drowned? *Held*, that the question was one for the determination of the jury. *Trew* v. *Assurance Co.*, 6 Hurl. & N. 839.   Where a temporary trouble, unusual and uncommon, causes one to fall into the water, and he is drowned, the company is liable. *Manufacturers' Acc. Indem. Co.* v. *Dorgan*, 7 C. C. A. 581, 58 Fed. 945.   So, where one was seized with an epileptic fit while crossing a stream, fell in, and was drowned, the company was held liable. *Winspear* v. *Insurance Co.*, 43 Law T. (N. S.) 459.

Dr. McGraw, after his attention had been called to the circumstances of this case, said:

"I would not say that he had an apoplectic stroke or committed suicide, but that he had some seizure which would take away his senses.   There are other things besides apoplectic strokes.   A man may die suddenly of heart failure under such circumstances.   But my judgment would be that either the man committed suicide, or that he died from some such sudden seizure while in the water."

The case, upon this point, was properly submitted to the jury.

2. Had the defendant waived its right to insist upon the breach of warranty as a defense?   No communication had been made to the company in behalf of Mrs. Winans, the beneficiary, until September 25th, when a letter was received from her attorney, Mr. Babcock, dated September 21, 1896, and reading as follows:

"Will you please send to me the blank forms you desire used for proofs of death?   I write in the interest of Mrs.

Eva Winans, wife of William N. Winans, deceased, who was insured by your policy No. 12,308. Mr. Winans was accidentally drowned while out rowing on the Detroit river."

In reply to that letter the company wrote, September 25th, as follows:

"We are in receipt of your communication of the 21st inst., asking that we send to you blank forms used for proofs of death; stating that you write in the interest of Mrs. Eva Winans, wife of Mr. William N. Winans, insured under policy No. 12,308, and that Mr. Winans was accidentally drowned while out rowing on the Detroit river. You fail to give any particulars, or even the date, of the alleged accident, which we are entitled to have immediately in case of accidental injury or death. Although we do not understand how you are going to affirmatively prove accidental death in this case, under the circumstances, yet we will comply with your request, and forward the blanks as requested, subject to the notices and stipulations printed thereon."

The blank proofs of death furnished contained the following notice:

"These blanks are sent to permit of a statement of facts, and the furnishing of same shall not be held to be a waiver of any of the agreements or conditions of the policy or of the application, nor of the rights of the company in the event of any violations of such agreements or conditions by the insured or beneficiaries, or in any event."

When proofs of loss were sent, does not appear. They gave all the other insurance, but made no mention of the subsequent policy. On November 20th the company wrote Mrs. Winans, informing her that it should rely upon this breach of warranty, and others, also, and inclosed her a draft, as a refund of all premiums paid. After the writs of garnishment were served, and on October 26, 1896, the company filed a disclosure, denying any liability. Soon after that, interrogatories to the garnishee defendant were filed, and by stipulation the time for answering the special interrogatories was extended to December 7th. By the fourth interrogatory the garnishee was

called upon to state for what reason or reasons it denied
liability upon the policy.   By interrogatory 5, the defend-
ant was required to state any statement or statements
made by the insured, or any one in his behalf, upon which
it relied as a ground for denial of liability.   It refused to
answer the fourth and fifth interrogatories.   It had, by
the terms of the policy, three months from the date of
filing proofs in which to examine and determine whether
it would acknowledge or deny liability, and asked that the
answer to these be postponed till after the expiration of
that time.   This was granted, and the defendant was en-
titled to it as a matter of right.   On February 1, 1897, it
filed answers to these two interrogatories, setting up seven
grounds of nonliability, of which we need mention but
two:   (1) That death did not result from bodily injuries
sustained through external, violent, and accidental means;
and (2) the breach of the agreement to notify the company
if any additional insurance was applied for or obtained.

The company, upon hearing of the death of Mr.
Winans, instructed its agents to investigate.   They did
so, and reported that they had been informed of this other
insurance, and also concluded that Mr. Winans had com-
mitted suicide.   Neither Mrs. Winans nor these garnishee
plaintiffs had given the defendant any information upon
which it acted.   It made, as was very proper, an inde-
pendent investigation.   Neither the plaintiffs nor Mrs.
Winans knew of this investigation, or were in any man-
ner misled by the conduct of the defendant.   They were
under no legal or moral obligation to inform Mrs. Winans
or plaintiffs of what they had learned from their investi-
gation.   No case that I have found or examined carries
the doctrine of waiver to the extent of holding that, when
a beneficiary asks for blank proofs of loss, the insurer
waives the defense of a breach of warranty by failing to
state that it has been informed that there had been a
breach of warranty.   The insurer has a right to keep
silent until proofs are furnished.   Had Mrs. Winans, in
her application for blank proofs, informed the company

that Mr. Winans had taken out other insurance, and the company had still furnished proofs, without insisting upon this as a defense, there would have been a waiver, under the authorities cited. On every occasion when the company was called upon to speak, it insisted upon this defense. The letter inclosing the blank proofs of loss called the attention of Mrs. Winans to the conditions of the policy and the application, and expressly stated that it would insist on every defense it had for violation of any agreement or condition therein. This was the first occasion on which defendant had been called upon to say anything. What language could be more definite, what statement more complete? This statement was made a part of the letter, just as effectually as though it had been copied in the letter. This is not controverted, and yet it is claimed that, because the defendant did not specifically and expressly state every defense it had or was informed of, and did in its letter hint at one defense, all others are waived. If the defendant had not stated in that letter, "We do not understand how you are going to affirmatively prove accidental death," would it have been held that it had waived the defense of suicide by its silence, because its agent in Detroit had written that Mr. Winans committed suicide? If defendant had inclosed proofs of loss without any letter, or with one stating that it waived no defense, would it have waived all violations of the contract of which it had before been informed? The logical result of plaintiffs' contention is to close the door to every defense, in the face of the most positive assertion that it relied upon all, and waived none. The defense of breach of warranty is a meritorious one. The defendant clearly did not intend to waive it. In language unmistakable it notified Mrs. Winans that it did not intend to waive it; and yet, because it did not specifically state this defense, a waiver is claimed.

While some authorities have gone very far to sustain a waiver, particularly of technical defenses, I find none that have gone to the extent now claimed. We are cited in

support of it to *Marthinson* v. *Insurance Co.*, 64 Mich.
372. The facts in that case are totally different from
those in this. In that case the property was burned July
29th, and notice immediately given to the local agents. An
adjusting agent came soon after. On August 21st two
adjusting agents met the insured, examined them under
oath, were then informed of the breaches of warranty, and
made no objection upon that ground. The insured then
obtained instructions from the local agents, made out
proofs of loss, and sent them to the company, September
2d. To this no answer was made till October 3d. Under
these circumstances the breaches were held to be waived.
It is urged that Mrs. Winans was put to the needless
expense of filling out proofs of loss. The record does not
show that she incurred any expense. The blanks were
furnished by defendant, and it was the work of a few
moments to fill them. It is idle to say that she incurred
any such expense as will affect the question. There was
no attempt to embarrass or hinder, as was found to be the
fact in the *Marthinson Case*, 64 Mich. 382; nor was she
misled or hindered in any way. "A waiver is the inten-
tional relinquishment of a known right." 28 Am. & Eng.
Enc. Law, 526, and the numerous authorities there cited.
Another authority defines it as follows:

"Waiver, in a general way, may be said to occur where-
ever one in possession of a right conferred either by law or
by contract, and knowing the attendant facts, does or for-
bears to do something inconsistent with the existence of
the right, or of his intention to rely· upon it, in which case
he is said to have waived it, and he is estopped from claim-
ing anything by reason of it afterwards." Bish. Cont.
§ 655; *United Firemen's Ins. Co.* v. *Thomas*, 27 C. C.
A. 42, 82 Fed. 406

This rule is just, and is founded in common sense and
fair dealing. To hold that a party has waived a good de-
fense, when upon the first opportunity he expressly, and
in writing, asserts that he relies upon every violation of
the contract under which claim is made, is not sanctioned

by reason or sound authority. It is not approved by the common judgment of mankind. There is not one rule of law for insurance companies, and another for individuals, partnerships, and other corporations. The law is no respecter of persons, and applies the same rule to all, whether acting in their individual or corporate capacity.

The learned circuit judge committed error in instructing the jury that this violation of the contract was waived. For this reason the judgment should be reversed, and a new trial ordered.

HOOKER, J., concurred with GRANT, C. J.

MONTGOMERY, J. I agree with my Brother, the Chief Justice, that it was a fair question for the jury in this case as to whether the death of Mr. Winans was the result of accidental drowning. I disagree with the Chief Justice upon the question of waiver. In my opinion, the circuit judge was right in charging the jury that the omission to notify the company of the fact of other insurance was waived. On receipt of the letter from Mr. Babcock, attorney for Mrs. Winans, asking for the blank forms which the company desired to have used for proofs of death, good faith required that, if the company expected to rely upon a defense which would render proofs of loss wholly unavailing, notice of this fact should be given promptly, inasmuch as it was made apparent by Mr. Babcock's letter that Mrs. Winans would otherwise be put to expense in the preparation of proofs of loss. The learned counsel for the defense, in their brief, say:

"The nature of the company's business should be kept in view. It might, from motives of business policy alone, be inclined to waive the breach of warranty, if, on investigation of all the facts, it came to the conclusion that an honest loss had been incurred."

This is undoubtedly true, and in my judgment the time for the company to determine that question was when it was made known to it that the withholding of such claims of defense, and the furnishing of blanks, would be likely

to result in expense to Mrs. Winans. Having failed to disclose the defense at that time, and having permitted the beneficiary to incur this expense, the defense should be deemed waived. *Marthinson* v. *Insurance Co.*, 64 Mich. 372; *Towle* v. *Insurance Co.*, 91 Mich. 219; *Titus* v. *Insurance Co.*, 81 N. Y. 410. The general statement appended to the blank proofs of loss, reserving a right to insist upon a breach of conditions, should not be held to reserve a defense known to the company at the time. *Marthinson* v. *Insurance Co.*, *supra.* Nor do I think that the fact that the information that Mr. Winans had other insurance was not derived from the beneficiary affects the question. It is knowledge of the fact, and the action of the company, requiring the beneficiary to incur expense, which renders it an act of bad faith to thereafter seek to avoid the policy.

The judgment should be affirmed.

MOORE and LONG, JJ., concurred with MONTGOMERY, J.