SUPREME TENT KNIGHTS OF MACCABEES OF THE WORLD v. KING.

(Circuit Court of Appeals, Sixth Circuit. January 20, 1906.)

No. 1,444.

1. INSURANCE—ACTION ON LIFE POLICY—DEFENSE OF SUICIDE.
   Upon an issue as to whether or not an insured committed suicide, where he was found dead under circumstances showing clearly that he killed himself, there is no presumption that his death was accidental; but such presumption arises only where the circumstances leave the cause of death in doubt.
   [Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, § 1663.]

2. SAME—PRESUMPTIONS—EVIDENCE TO OVERCOME.
   Whatever presumptions exist that an insured did not commit suicide may be overcome, not only by oral testimony, but by reasonable deductions or inferences from the facts established; and, where such inferences lead irresistibly to the conclusion that the case was one of suicide, the court is justified in withdrawing the question from the jury.
   [Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, §§ 1663, 1720.]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Eugene Lehman, Elias Gates, and L. Lehman, for plaintiff in error.

F. Zimmerman, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit upon a benefit certificate or policy of life insurance for $3,000 upon the life of one John King. It was brought by King's widow, the beneficiary, against the fraternal beneficiary association which issued it. One of the laws of the association provided that no benefits should be paid on account of the death of a member when death was the result of suicide, whether the member taking his own life was sane or insane at the time; but that, in case of suicide, the beneficiary should receive twice the amount of assessments paid. While several defenses were pleaded, they were narrowed, on the trial, to the one defense, that King committed suicide, whether he was sane or insane at the time. A tender of twice the amount of the assessments paid, being $543, was made. The question whether King committed suicide or not was submitted to the jury upon certain charges, and a verdict found for the face of the policy, with interest, which the court declined to disturb. A number of questions were argued which were not properly reserved. It will be necessary for us to consider but one, whether the court properly submitted to the jury the question of suicide.

The following facts appear in the record:

King was a policeman in Memphis. He took out this policy on November 17, 1893. He died on December 13, 1903, about midnight. In 1894, while on the force, he was shot through both lungs. Before receiving this wound, he was of exceptionally fine physique, six feet two inches in height, and weighing over 200 pounds. The wound seriously affected his health. He had hemorrhages, suffered a great deal, and

lost much flesh. At the time of his death he weighed only 145 to 150 pounds. His disposition suffered. He complained constantly, and was cross and irritable. It was in evidence, also, that he suffered from appendicitis and severe cramps, and about a month before his death took an overdose of laudanum. His mind was also apparently affected. He talked too much about money, about winning in gambling and at the races, and about a big legacy, received or expected. One of his friends on the force said "he seemed to be crazy over money"; another, that he was "a little flighty at times"; another, that it had got to be regarded that he was "talking through his hat." The testimony showed that shortly before his death he was gambling and was borrowing money from relatives and friends.

Among King's friends was one Henry Kressenberg, who ran a grocery on King's beat. Kressenberg was in the habit of carrying his money home at night. At times he had from $500 to $2,000 to take home. His biggest business days were Saturday and Sunday, and King was aware of this. About two years before Kressenberg was attacked while going home, and an attempt made to rob him, which failed. King was told of this and advised him always to leave his store by the front door, and frequently accompanied him home. On the night of Sunday, December 13, 1903, King was not on duty. Kressenberg and his wife were at the store when closing time came, about 11 o'clock at night. Kressenberg had about $800 or $900 to carry home. When he prepared to leave, he put the currency and gold into his pocket, and the silver into a shot bag, which he carried under his left arm. His left hand was crippled. He placed his revolver upon the bag. It was a 32 or 38 caliber. As he and his wife stepped out the front door, they noticed a tall man standing eight or ten feet away. This man had on dark trousers, a light tan overcoat, a fur or plush cap pulled down over his eyes, and across the lower part of his face a red handkerchief. He also held a white handkerchief before his face. He was tall and slender. Mrs. Kressenberg got excited and remarked to her husband, who was locking the door, that the man looked suspicious, but Kressenberg locked the door, and they turned to go home. As the two started, the man rushed upon Kressenberg and fired a shot, which entered his ear and came out the opposite cheek and then a second shot which entered his abdomen, and from which he died the next morning. After being shot himself, Kressenberg shot the robber, who, without making any attempt to seize the money, fled.

The police were called, and, hurrying in the direction given them by Kressenberg and his wife, found a man lying dead across a bridge over a gutter, about two blocks away. The man was shot in the right temple. His cap was burning. He had a red handkerchief tied around the lower part of his face. Removing the cap and handkerchief, and striking a match, they identified the body as that of John King. He had on a dark suit, a light tan overcoat, and a black fur cap. He was lying on his left side, with his pistol in his right hand. It was a large 41 or 45 caliber Colt's revolver. Three of the chambers were empty. The wound in his temple was made by a ball of the caliber of his pistol, and so were the two wounds found in Kressenberg. Kressenberg's

pistol was of a smaller caliber, 32 or 38. One of its chambers was empty, and a 'wound was found in King's groin made by a bullet of this caliber. The wound in the groin had bled freely. The wound in the temple ranged upward and reached the brain. King's pistol was large and powerful. As one of the witnesses put it, "a ball fired from such a pistol into a man's brain would drop him right in his tracks." Both the cap and the overcoat that King wore that night he had borrowed for the occasion, the cap from one person and the overcoat from another. In addition to wearing them, pulling his cap down over his eyes and tying the red handkerchief over the lower part of his face, he had, for the purpose of disguising himself, removed his false teeth, which were found in his rear pocket. He left his home about half past 8 o'clock, saying he was going to hunt for some negroes.

In view of these facts shown in evidence and being substantially all that were shown bearing upon the question of suicide, the case, it seems to us, was a simple one. The question whether King was sane or insane was immaterial. If he killed himself, whether sane or insane, the association was not liable for the face of the policy, but only for twice the assessments paid. King was killed by the shot fired into his right temple. This is plain. And it is equally plain that that shot came from his own pistol, which was found in his right hand. The only question was, did he voluntarily fire the shot himself? Or was the discharge of the pistol accidental? Now, it is true no one saw him fire the shot. The defendant was unable to put on the stand an eyewitness of the act, but the established facts left the matter in no doubt. Disposition, motive, and acts done, all in evidence, left but one reasonable conclusion to be drawn, namely, that he purposely killed himself.

King was in need of money, and in a condition of mind and body which provokes to desperate deeds. He knew Kressenberg's habits, and he disguised himself and laid·in wait, intending to murder and rob him. He shot his friend twice, mortally wounding him, but unfortunately was wounded himself, and was forced to flee, leaving the money behind. He knew as he fled that he had probably murdered his friend and that his brother officers would at once be hot in pursuit. His own wound was serious, and he soon became faint from loss of blood. He realized he could not escape. Before him was instant discovery, arrest, disgrace, imprisonment, and at the end the gallows. It was that or death at his own hand, and he chose the latter. The condition of the body, the circumstances surrounding its discovery, negatives any theory of accident. As we have stated, the shot in the right temple killed him, and the bullet came from the Colt's revolver found in his right hand. That revolver was held against his right temple, for the discharge set his cap afire. It was found burning. No reasonable inference could be drawn except that he held the revolver there himself and purposely pulled the trigger.

No request was made by the defendant for a peremptory instruction, either upon the whole case or with respect to the disputed fact of suicide. A number of requests to charge were made by each side, some of which were given and some refused; but no proper excep-

tions were taken, either to those given or refused. Nor was there any proper exception taken to any portion of the judge's charge. But, after the court had charged the jury, the defendant requested an additional charge, which was refused, and a proper exception taken. Among the charges requested by the plaintiff, which the court gave, were the following:

"If you find that John King was found dead with a wound in his head, the burden of proving that he inflicted this wound upon himself, whether sane or insane, rests on the defendant, and, if the defendant has failed to prove by the preponderance of the evidence that said wound in the head was inflicted by his own hand, then you will find that John King did not commit suicide.

"In the case of death of an individual by violence the law will presume that death was accidental, and not intentional on the part of the dead man, and if it appears that John King died from a wound in the head, and that such wound was the proximate cause of his death, if the plaintiff has not proven by the preponderance of the evidence that the death was intentionally caused by the dead man, you will find that John King did not commit suicide."

As we have said, no proper exceptions were taken to the giving of these propositions, but at the conclusion of the entire charge, and evidently because of them, the defendant requested the court to give the following additional charge, which the court refused to do, and an exception was taken:

"I charge you that the presumption of law against suicide may be overturned, not only by verbal testimony, but also the reasonable deductions from the facts established; that on this question you are to be governed by what is the reasonable probability; that the fact of suicide need not be shown beyond a reasonable doubt, but by a mere preponderance of the evidence."

We think the court erred in not giving this charge. The natural effect of the charges given was to mislead the jury into believing that, since King was found dead, the legal presumption against suicide and in favor of accidental death required the defendant to produce affirmative and direct proof, a preponderance of evidence, showing that he had killed himself. The circumstances surrounding him as he lay dead, and the reasonable inferences therefrom, all pointing infallibly to suicide, were apparently excluded. In view of this, we think the additional charge tended to elucidate and clarify, and should have been given. Where a man is found dead under circumstances showing clearly that he killed himself, there is no presumption that his death was accidental, at least none which requires additional evidence to overcome. There is only a presumption that death was accidental where the man is found dead under circumstances leaving the cause of death in doubt. Travelers' Ins. Co. v. Nicklas, 88 Md. 470, 41 Atl. 906; Travelers' Ins. Co. v. Sheppard, 85 Ga. 802, 12 S. E. 18; Carnes v. Ass'n, 106 Iowa, 281, 76 N. W. 683, 68 Am. St. Rep. 306; Burnham v. Casualty Co., 117 Mich. 142, 75 N. W. 445; Brown v. Sun Life (Tenn. Ch. App.) 57 S. W. 415, 51 L. R. A. 252. And whatever presumption exists may, in any case, be overcome, not only by oral testimony, but by reasonable deductions or inferences from the facts established. Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 667, 8 Sup. Ct. 1360, 32 L. Ed. 308; Somerville v. Indemnity Ass'n, 11 App. D. C. 417; Johns v. Mutual Relief Ass'n, 90 Wis. 332, 63 N. W. 276, 41 L. R.

A. 587; Agen v. Metropolitan Life Ins. Co., 105 Wis. 217, 223, 80 N. W. 1020, 76 Am. St. Rep. 905; Clement v. Clement, 113 Tenn. 40, 52, 81 S. W. 1249; 4 Cooley, Briefs on Ins. 3256.

So irresistible were the reasonable inferences to be drawn from the established facts in this case that the court might well have withdrawn the question of suicide from the jury, and directed a verdict for the defendant. Somerville v. Indemnity Ass'n, 11 App. D. C. 417; Johns v. Mutual Relief Ass'n, 90 Wis. 332, 63 N. W. 276, 41 L. R. A. 587.

The judgment is reversed, and the case remanded for further proceedings not inconsistent with this opinion.