CURTH *v.* NEW YORK LIFE INS. CO.

1. EVIDENCE—PRESUMPTIONS—DEATH—SUICIDE.
    There is a presumption of law against suicide where death has occurred from unnatural causes.

2. SAME—PRESUMPTION AGAINST SUICIDE DISAPPEARS UPON INTRODUCTION OF EVIDENCE.
    Upon introduction of evidence to rebut presumption that death did not result from suicide, presumption disappears and is not to be treated as evidence by jury in reaching a verdict.

3. INSURANCE—SUICIDE—BURDEN OF PROOF.
    In action on life insurance policy containing double indemnity clause insurer has burden of proving suicide by evidence, direct or circumstantial.

4. SAME—SUICIDE—DIRECTED VERDICT.

> The court may take case from jury and direct verdict in favor of insurer where evidence in action under double indemnity clause of life insurance· policy shows that the only reasonable hypothesis is that of suicide and is inconsistent with any other explanation.

5. SAME—DOUBLE INDEMNITY CLAUSE—GREAT WEIGHT OF EVIDENCE.

> In action under double indemnity clause of life insurance policy, verdict for plaintiff *held*, not against the great weight of the evidence.

6. APPEAL AND ERROR—IMPROPER ARGUMENT—QUESTIONS REVIEWABLE.

> In action against insurance company to recover double indemnity on policy of life insurance, remarks of plaintiff's counsel in argument to jury to effect that insurance companies sought to avoid liability by requiring beneficiaries to sue to recover *held*, unsupported by record and improper but not reversible error where opposing counsel, in taking his exception, failed to ask for a ruling or that the jury be instructed to pay no attention to them.

7. TRIAL—INSTRUCTIONS—QUESTIONS NOT IN ISSUE.

> It is not error for trial judge to fail to instruct on an issue not before jury, hence, in action under clause of life insurance policy giving double indemnity in case death was effected solely through external, violent and accidental means, where declaration stated a claim for double indemnity and amount due, defense interposed was that insured committed suicide, defendant restricted the issue for jury to question of whether or not it was a case of suicide and proffered no requests relative to requiring plaintiff to sustain burden of proof that death came within double indemnity clause, judge committed no error in failing to so instruct.

8. JUDGMENT—ENTRY NUNC PRO TUNC.

> In action under double indemnity clause of life insurance policy where jury answered special questions in favor of plaintiff but general verdict as to amount was not entered by clerk and omission was not discovered for about five months, judgment in accordance with instructions, as to which no complaint was made, *held*, properly entered *nunc pro tunc*, since under the circumstances the jury's finding of fact required entry of judgment in amount determined by the court (3 Comp. Laws 1929, §§ 14148, subd. 12; 14149).

9. SAME—INFORMALITIES.

> A judgment may not be stayed for any informality in entering
> it or making up the record thereof (3 Comp. Laws 1929,
> §§ 14148, subd. 12; 14149).

Appeal from Hillsdale; Taylor (Mark D.), J. Submitted January 9, 1936. (Docket No. 27, Calendar No. 38,725.) Decided March 2, 1936.

Assumpsit by Edward Curth and wife against the New York Life Insurance Company, a foreign corporation, on a life insurance policy containing a double indemnity clause for accidental death. Verdict and judgment for plaintiffs. Defendant appeals. Affirmed.

*Samuel B. Keene* and *Chandler & Culver,* for plaintiffs.

*Merton Fitzpatrick* and *Adams, Van Horn & Bloem,* for defendant.

BUTZEL, J. Plaintiffs brought suit as beneficiaries under a life insurance policy issued by defendant on the life of their son George who died within the year after the issuance of the policy. The policy of a face value of $1,000 also provided for double indemnity if death resulted directly, and independently from all other causes, from bodily injury, effected solely through external, violent and accidental means; that neither the face benefits of the policy nor the double indemnity should be payable if death resulted, among other causes, from self-destruction by insured, whether sane or insane, within the first two insurance years; that if such self-destruction occurred within the first two years after the issuance of the policy, the company would be liable only for

a sum equal to the amount of the premiums that had been paid to and received by the insurance company and no more.

It was the claim of plaintiffs that George died as a result of accidental injuries sustained under conditions not specifically excepted in the policy. Defendant planted its entire defense upon the claim that the deceased committed suicide. This became the real issue in the case. Defendant requested that three special questions be submitted to the jury, each to be answered "yes" or "no." The response to the first question: "Was George M. Curth shot and killed by some one other than himself?" was "Yes." The answers to the questions whether the deceased shot himself with intent to commit suicide, and whether he accidentally shot himself, were "No." Judgment was rendered in favor of plaintiffs in the sum of $2,596.45.

The main claim on appeal is that the finding of the jury was against the great weight of the evidence. It thus becomes necessary to briefly review the testimony. The deceased was 20 years of age when he met his death sometime late in the afternoon on Sunday, February 10, 1929, at plaintiffs' home. He had a high school education, was unmarried, and was working regularly operating a machine and doing piece work for an engine company. His wages were good, he had a bank account, and owned a Ford coupe purchased from his own savings. He was in good health, had a cheerful disposition, no bad habits and had made plans to continue his education. He had many friends and apparently no trouble with anyone. He attended dances and had been keeping company with a young lady, with whom he had been on very friendly terms, and who married subsequent to his death. While there was

some discussion as to letters which he had written to this young lady, only one of the letters was produced and as even this letter was not included in the record, we conclude that the letters and the colloquy in the lower court concerning them were of no value in solving the mystery of George's death.

Ford Curth, a brother of George, was 32 years of age, but of retarded mentality. He left school when in the fifth grade, could read only a few words, spoke but little and in such a manner that he could only be understood by those who knew him well. For the latter reason, he was unable to testify at the trial.

At about 3 o'clock in the afternoon of the day of George's death, plaintiffs left their home in his car. Only George, his brother Ford, and a roomer who occupied a room on the third floor of the house, remained in the house. On Sunday afternoons it was George's habit to take a bath, followed by a nap, and then to go out in the evening. There was testimony that late in the afternoon of this particular day, Ford and two boys were seen in the vicinity of plaintiffs' home for five minutes, and sometime after they were lost sight of an explosion was heard that sounded like the backfire of a car. Another witness testified that two young women were seen leaving the front porch of plaintiffs' home later the same afternoon.

About seven or eight in the evening, plaintiffs, on returning home, found a light burning in the living room. Not hearing any sound, they assumed that no one was in the house and that George had gone out without his car. About 9 p. m. when Mrs. Curth went upstairs to George's room to set his alarm clock, she saw him lying in bed as if asleep, but with such a pallor on his face that she became alarmed. She called her husband who had already retired. He

immediately rushed to neighbors to sound an alarm, and a doctor was summoned. The doctor, on arrival, rolled the bedclothes down and discovered that there was a gunshot wound just below the heart and that George was dead. The coroner was called, the covers were removed and the body examined. It was lying on its right side with the feet, legs and knees slightly flexed. The legs were not bent back much from the knees down.

A shotgun which had belonged to another brother and been in the house for a long time was found in the bed with the muzzle of the gun about 10 to 12 inches away from the wound but pointed towards it and the stock pointed towards the foot of the bed. The wound was "about three-quarters of an inch large," about an inch below and three inches to the right of the left nipple. The doctor probed the wound with a pencil. The direction of the shot was upward and outward. The wound went towards the shoulder, but not through the body. There was no hole in the union suit of underwear which George wore; the top button was buttoned but the next two or three unbuttoned and the suit pulled open where the wound was. There was a small quantity of blood on the body; some on the fingers of the left hand; some on the right side of the wound as though it was dribbling down from the wound; a spot on the upper sheet about eight or ten inches in diameter with a coppery color in its center. The deceased's shoes were by the side of the bed, his trousers hung on the corner post at the foot of the bed. The bed clothing was not disheveled or disturbed in any way. With the exception of the top of his shoulder, his body was completely covered with the bedclothes. There was no blood on the carpet nor on the top bedding. There was nothing to indicate a struggle. There

was some money in the trousers' pocket. No finger
prints were found on the gun. A ballistic expert,
with long experience with the Detroit police depart-
ment, testified that he had conducted a number of
experiments to ascertain whether it was a case of
suicide. He stated, on the one hand, that if the shot-
gun were shot at a distance of one inch to several
feet from the body, the wound would show powder
burns and a very large hole would result. Neither
of these conditions was noticed by observers who
examined the body. On the other hand, he testified
that if the gun were pressed tight up against the
chest wall, that, although no burns would be shown
as a result of the shot, it would do one of two things:
the portion of the barrel right at the very end where
the obstruction occurred would be blown off, or there
would be a big ring blown in the barrel; there, how-
ever, was no ring in the barrel of the shotgun nor
was the end of the barrel blown off. As no burns
appeared on the body and no ring in the shotgun, the
testimony of the expert is quite persuasive that
decedent did not commit suicide. An experiment
was performed by the deputy sheriff in charge of
the case. After chloroforming a live pig, weighing
about 50 pounds, placing it in the bed and covering
it with bedclothes, he pressed a shotgun similar to
the one found in the bed, loaded with Peters H.C.
shells with which George had been shot, against its
body and pulled the trigger by means of a string at-
tached to the trigger and extending through the
sheets at the bottom of the bed into the hall. He
testified that there was but a slight recoil of the
gun, that the hole in the body of the pig was but
little larger than the muzzle of the gun and there
was some discoloration on the sheet. There were
no powder burns on the flesh. He stated there might

have been a small space between the clothes and the muzzle of the gun. The testimony of both the plaintiffs, however, was directly the opposite. They testified that as a result of the experiment, the bed clothing was torn and burned, that the wound was much larger and that considerable flesh was scattered on the sheet.

The main question before us is whether the finding of the jury that the deceased did not commit suicide was against the great weight of the evidence. Plaintiffs properly contend that where death has occurred from unnatural causes, there is a presumption of law against suicide. In *Burnham* v. *Interstate Casualty Co.,* 117 Mich. 142, the question was whether the death of the insured by drowning was attributable either to suicide or accident. The court held:

"The learned counsel for the defendant insist that the facts * * * are consistent with three theories of the cause of death, and therefore prove no one of them. These theories are apoplexy, sudden seizure, and suicide. We cannot agree in this conclusion. The testimony does not establish facts to overcome the presumption. Where death may be attributable to suicide, murder, accident, or negligence, the presumption of law is against suicide and murder."

See, also, *Powers* v. *Loyal Protective Ins. Co.,* 266 Mich. 153, 156.

When testimony is offered to rebut this presumption, as was done in the instant case, the presumption that death did not result from suicide disappears and is not to be treated as evidence by the jury in reaching a verdict. 95 A. L. R. 878, 887; *Von Crome* v. *Travelers' Ins. Co.* (C. C. A.), 11 Fed. (2d) 350, 352; *Modern Woodmen of America* v. *Kincheloe,* 175 Ind. 563 (94 N. E. 228, Ann. Cas. 1913 C,

1259*) ; *Woodmen of World* v. *Alexander* (Tex. Civ. App.), 239 S. W. 343; *Griffith* v. *Continental Casualty Co.,* 299 Mo. 426 (253 S. W. 1043); *Watkins* v. *Prudential Ins. Co.,* 315 Pa. 497 (173 Atl. 644, 95 A. L. R. 869). However, the ultimate burden of proof on the issue of suicide rests upon the defendant and it must meet this burden by a preponderance of evidence, direct or circumstantial. In *Ferris* v. *Court of Honor,* 152 Mich. 322, in a suit on an insurance policy, the defense of suicide was raised. The question was raised as to the burden of proof on that issue, and the court held:

"This question has been frequently before the courts in both life and fire insurance cases. From an examination of these cases, it appears that the general rule of law has been established, that provisions such as the one under discussion have been held to be conditions subsequent, and therefore that the burden of proving that the case comes within the proviso or condition of the policy being a matter of defense devolves upon the defendant. This court has approved and affirmed this doctrine."

Also, see, *Bromberg* v. *North American Life Ins. Co.,* 192 Mich. 143, 146; *Ruterbusch* v. *Supreme Court of the Independent Order of Foresters,* 162 Mich. 213, 216; *John Hancock Mutual Life Ins. Co.* v. *Moore,* 34 Mich. 41, 44; *Bilderback* v. *Security Benefit Ass'n* (Mo. App.), 257 S. W. 176; *McKendree* v. *Southern States Life Ins. Co.,* 112 S. C. 335 (99 S. E. 806); *New York Life Ins. Co.* v. *Turner,* 213 Ala. 286 (104 South. 643); *International Life Ins. Co.* v. *Carroll* (C. C. A.), 17 Fed. (2d) 42 (50 A. L. R. 362); *Davis* v. *Reliance Life Ins. Co.* (C. C. A.), 12 Fed. (2d) 248. Where, however, the evidence, whether direct or circumstantial, shows that the only reasonable hypothesis is that of suicide

---

* See same case in Appellate Court, 91 N. E. 976, 92 N. E. 452.— Reporter.

and is inconsistent with any other explanation, the court may take the case from the jury and direct a verdict in favor of the insurance company. *Furbush* v. *Maryland Casualty Co.,* 131 Mich. 234, 238 (100 Am. St. Rep. 605); *Connally* v. *Railroad Co.* (C. C. A.), 4 Fed. (2d) 539; *New York Life Ins. Co.* v. *Weaver* (C. C. A.), 8 Fed. (2d) 680; *New York Life Ins. Co.* v. *Bradshaw* (C. C. A.), 2 Fed. (2d) 457; *Supreme Tent Knights of Maccabees* v. *King,* 73 C. C. A. 668 (142 Fed. 678); *Von Crome* v. *Travelers' Ins. Co.* (C. C. A.), *supra; Travellers' Ins. Co.* v. *McConkey,* 127 U. S. 661, 667 (8 Sup. Ct. 1360); *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569 (243 S. W. 831); *Bernick* v. *Illinois Commercial Men's Ass'n,* 175 Ill. App. 511; *Green* v. *New York Life Ins. Co.,* 192 Iowa, 32 (182 N. W. 808); *Eckendorff* v. *Mutual Life Ins. Co. of New York,* 154 La. 183 (97 South. 394); *Webster* v. *New York Life Ins. Co.,* 160 La. 854 (107 South. 599); *Fletcher* v. *Sovereign Camp Woodmen of America,* 81 Miss. 249 (32 South. 923); *Griffith* v. *Continental Casualty Co., supra; Miller* v. *National Council Knights & Ladies of Security,* 109 Neb. 199 (190 N. W. 495); *Skala* v. *New York Life Ins. Co.,* 24 N. M. 78 (172 Pac. 1046); *Felix* v. *Fidelity Mutual Life Ins. Co. of Philadelphia,* 216 Pa. 95 (64 Atl. 903); *Clement* v. *Clement,* 113 Tenn. 40, 52 (81 S. W. 1249); *Agen* v. *Metropolitan Life Ins. Co.,* 105 Wis. 217 (80 N. W. 1020, 76 Am. St. Rep. 905); *Voelkel* v. *Supreme Tent Knights of Maccabees of the World,* 116 Wis. 202 (92 N. W. 1104); *Johns* v. *Northwestern Mutual Relief Ass'n,* 90 Wis. 332 (63 N. W. 276, 41 L. R. A. 587). We believe that on the question of suicide the evidence in the instant case presented a question for the determination of the jury, that this was not a case where the evidence showed that the only

reasonable hypothesis was that of suicide and was inconsistent with any other reasonable explanation. Although it may be claimed that the physical facts point towards suicide, and it is conceded that the roomer could not in any way have been connected with the tragedy, and there is no direct showing that anyone else, for that matter, could have caused his death, there is sufficient testimony tending to leave us doubtful of the cause of the boy's death. Testimony was offered to show that in the position decedent was lying, his reach was only sufficient to reach the trigger guard of the gun. Unless we impute a motive due to something that might have been passing through the mind of a boy emerging from adolescence, a theory not supported by the record, no motive whatsoever was shown for suicide. In this respect, the case differs from that of *New York Life Ins. Co.* v. *Alman* (C. C. A.), 22 Fed. (2d) 98, in which the court held that, under a somewhat similar fact situation, the lower court was in error in its holding that suicide was not the cause of death. However, in that case there was considerable positive testimony showing a motive for suicide. The lack of motive, the position of the boy's body and of the shotgun, the insufficient length of the boy's reach, the marks on the bedclothing and on the body, the nature of the wound and the fact that the bedding completely covered the body the same as if spread over the body by one who normally had gone to sleep, all support the theory that the boy did not commit suicide. While there is doubt by some of us whether we would have reached a like verdict had we been on the jury, it cannot be said that the verdict was against the great weight of the evidence or that the evidence was inconsistent with any other reasonable hypothesis but suicide.

Mr. Keene, one of plaintiffs' attorneys, in his argument to the jury evolved a theory of how the rate of insurance premiums was arrived at and that the insurance companies "dope the figures out and they give you the price. Take it or leave it. And then they come in here and make it a 12 to 1 shot here." He further stated:

"The only reason that they are here is to save the money that they owe."

These remarks were unsupported by the record and absolutely improper. They should have been excluded by the trial judge with proper admonition. While we appreciate that in a heated argument many improper statements may be made, it is difficult to understand why attorneys will jeopardize the result of a case through making improper statements to the jury, particularly when at times the evil may be so great that it cannot even be cured by a charge of the court. After the remarks were made, however, defendant's attorneys stated that they took exception to the argument. Whereupon, Mr. Keene stated: "That is the purpose of the defense." Defendant's attorneys replied:

"It is unwarranted by the testimony and there is no testimony in the case to the effect capable of being argued."

The trial judge was not asked to make a ruling nor to charge the jury not to pay any attention to the remarks. At the end of the charge, attorneys for both sides were invited to make any further suggestions but they remained silent. Consequently, we may not reverse the case on the impropriety of the remarks as the objecting attorney in taking his exception failed to ask for a ruling, or that the jury

be instructed to pay no attention to them. Merely taking an exception is insufficient. The general rule is stated in *Heck* v. *Henne*, 238 Mich. 198:

"To save the point for review, it was necessary not only to take an exception, but to also request the court, either then and there, or in final instructions, to instruct the jury to disregard the improper argument. *Spencer* v. *Johnson*, 185 Mich. 85; *People* v. *Maczulski*, 194 Mich. 193; *Walz* v. *Peninsular Fire Ins. Co.*, 221 Mich. 326; *Genack* v. *Gorman*, 224 Mich. 79.".

The defendant claims the judge did not sufficiently charge the jury that the burden was on plaintiffs to show that their son died through bodily injury effected solely through external, violent and accidental means. The declaration in this case stated a claim for double indemnity under the provisions of the policy. Defendant's counsel stated that the defense was solely that the insured committed suicide. Proof was given as to the amount due on the double indemnity feature of the policy and defendant's attorneys by the questions submitted to the jury restricted the issue to the question of whether it was a case of suicide or not. The attorneys did not suggest any further instructions to the jury when invited to do so by the trial judge. The defendant claims that the judge should have instructed the jury that the burden of proof was on the plaintiffs to show that this was an "accidental" death within the provisions of the double indemnity clause, but defendant, by its own acts, conceded that the sole question before the jury was whether decedent had committed suicide or not. It was not error for the judge to fail to instruct on an issue not before the jury.

The jury answered the three questions in favor of the plaintiffs. The judge had instructed them that in case they found that the insured did not commit suicide, defendant was liable for the double indemnity and interest. No question is raised as to the computation of the amount of interest. After an appeal had been taken and almost five months after the rendition of the verdict by the jury, it was discovered that the jury had only answered the three questions and had not stated the amount of the damages that under the issues as limited necessarily followed as a result of their findings. It is obvious that both parties believed that such judgment had been entered at the time the jury rendered the verdict. Plaintiffs thereupon made a motion that a judgment be entered for the amount as charged by the judge. The motion was granted and judgment entered *nunc pro tunc* for the amount of the double indemnity plus interest. The finding of fact by the jury not only justified but required the entry of the judgment as determined by the court in the sum of $2,596.45. The clerk having omitted to enter a general verdict in accordance with such findings, such omission could be properly cured by the court entering a judgment as of the date of the rendition thereof. 3 Comp. Laws 1929, §§ 14148, subd. 12; 14149, provide that the judgment may not be stayed for any informality in entering a judgment, or making up the record thereof. It was proper under the circumstances of the case for the judge to enter a judgment *nunc pro tunc*. See *In re Shepard,* 109 Mich. 631; *Grand Rapids Savings Bank* v. *Widdicomb,* 114 Mich. 639; *Taber* v. *Wayne Circuit Judge,* 156 Mich. 652; *Goebel Brewing Co.* v. *Medbury,* 153 Mich. 49.

Other errors in the trial of the case and charge of the court claimed by defendant are either non-existent or have been fully covered by the foregoing discussion, or are of a harmless nature.

The judgment is affirmed, with costs to plaintiffs.

NORTH, C. J., and FEAD, WIEST, BUSHNELL, EDWARD M. SHARPE, POTTER, and TOY, JJ., concurred.