## Mutual Protective League v. Walker.

(Decided March 4, 1915.)

### Appeal from McCracken Circuit Court.

1. Insurance—Waiver of Forfeiture—Acts or Conduct That Will Not Amount to.—Where an insurance company, before it had definitely declined to pay the certificate, or any proofs of death had been furnished, or anything had been done looking towards an adjustment of the claim, wrote a letter to the beneficiary inviting him to a conference, which he attended, at a loss of time and expense, the act of the insurer did not waive its right to rely on the defense that the policy had been forfeited during the life of the insured.

2. Insurance—Waiver—Forfeiture—Acts or Conduct That Will Amount to.—If an insurance company, with knowledge of facts vitiating the policy, enters into negotiations with the insured by which it recognizes or treats the policy as valid, while withholding notice of the fact that it does not intend to pay the insurance, such acts will operate as a waiver of the forfeiture.

3. Insurance—Waiver—Acts That Will Amount to, Before and After the Loss.—There is, however, a marked difference between the effect as a waiver of acts or declarations of the insurer during the life of the policy and before the loss has occurred, and the effect of acts or declarations after the loss has occurred.

4. Insurance—Waiver of Forfeiture—Acts That Will Amount to After Loss Has Occurred.—After the loss has occurred, the company may waive its right to rely on the forfeiture by subjecting the insured to trouble and expense in preparing and submitting proofs of loss when it knows it does not intend to pay the policy or when it commits other definite and affirmative acts that subject the insured to loss or expense, while acting under the reasonable belief, induced by the conduct of the insurer, that it intends to pay the policy. To constitute a waiver after loss there must be a distinct recognition by acts or declarations of the validity of the policy, or an intention to abandon or not to insist on the forfeiture.

D. G. PARK for appellant.

S. H. CROSSLAND and W. MIKE OLIVER for appellee.

Opinion of the Court by Judge Carroll—Reversing.

This appeal is prosecuted from a judgment in favor of the appellee, H. A. Walker, against the appellant League, for one thousand dollars recovered upon a benefit certificate issued upon the life of J. N. Walker and payable to the appellee as his wife.

The appellant is a benevolent or fraternal society, and the certificate here in question was issued in February, 1912. The insured, J. N. Walker, died March 25, 1913, and the appellant refused to pay the insurance specified in the certificate upon the ground that the insured was in default in the payment of his monthly assessments, and this failure, under the contract, had worked a forfeiture of the certificate. Upon a refusal to pay, the appellee, as the beneficiary, brought this suit, and on a trial there was a verdict in her favor and judgment accordingly.

Several issues were made by the pleadings, but the case went to the jury upon the single issue that the appellant by its acts and conduct after the death of the insured had waived its right to or was estopped to rely on the forfeiture. The trial court was evidently of the opinion that this issue was the only one upon which the appellee was entitled to go to the jury, and counsel for appellee seem to concur in this view of the matter, saying that the only question involved on this appeal is the correctness of the instruction given by the trial court. In view of this situation, it seems only necessary that we should consider this instruction and the evidence upon which it was based.

This instruction, which sets out very clearly the grounds upon which a recovery was sought and had, is as follows:

"The court instructs you to find for the defendant, unless you shall believe from the evidence in this case that after the deceased, J. N. Walker, had failed to pay the dues or assessments owing by him to defendant, and the benefit certificate on which this suit was brought had been forfeited by the failure to pay said assessments, and after said Walker's death, that the defendant, with full knowledge that said benefit certificate had been forfeited on account of said failure, did, by one of its supreme officers or agents, other than Otis Clark, authorized to pay plaintiff or settle with her, request the

plaintiff, beneficiary under said benefit certificate, to lose time or incur expenses, in leaving her home in Graves County, Kentucky, and in coming to Paducah, Kentucky, for the purpose of negotiating a settlement of her claim under said benefit certificate, and without notifying her that it was intended to rely upon said forfeiture for non-payment of dues or assessments by said J. N. Walker, and that plaintiff, at the request of defendant, or its said officers, aforesaid, did lose time or did incur expenses in coming to Paducah in an effort to effect a settlement with defendant, and would not have done so had she known that defendant intended to rely on the said forfeiture of said benefit certificate, in which event, and if you shall so believe, then the law is for the plaintiff, and you will find for her, $1,000, with interest from September 22, 1913.''

It appears from the record that the appellee is an Illinois corporation, with a local council in Paducah, Kentucky. The financial and recording secretary of the Paducah council, who may be said to have been the agent of the Supreme Council and to have had charge of the business affairs of the Paducah council, was C. W. Clark. Otis Clark was a son of C. W. Clark, and at his father's request and under his direction attended to a good deal of the business attached to the office of secretary. Otis Clark was also well acquainted with and apparently a friend of the Walkers, and had been assisting J. N. Walker in keeping paid his assessments. It appears, however, that at the time J. N. Walker died there was some difference of opinion between the Walkers and the local council as to whether or not Walker, through Otis Clark, had paid all of his assessments as they fell due, and also in reference to efforts to reinstate Walker, who had apparently been dropped from membership on account of his failure to pay his assessments. At any rate, there is enough in the record to show that the League was disputing its liability to pay the insurance on account of the failure of Walker to keep up his assessments, while Mrs. Walker was claiming that the assessments had all been paid and her husband reinstated.

With this condition existing, Otis Clark, on March 30, 1913, wrote the following letter to Mrs. Walker, the appellee.

"Mrs. H. A. Walker, Fulton, Ky. Companion: Please come to Paducah not later than Tuesday morning on the noon train. One of the Supreme Board of Directors is here and wants to see you. So it is necessary for you to come Tuesday on the noon train. If you haven't the money, borrow it, and he will give it back to you. Yours fraternally, Otis Clark."

In response to this letter Mrs. Walker went from her home in Graves County to Paducah, a distance of something over fifty miles, at an expense of about three dollars. While at Paducah on this trip she met a Mr. Parrish, one of the Board of Directors of the League, who made an effort to compromise her claim by paying the burial expenses of her husband, which offer she declined to accept. Testifying in regard to this interview with Mr. Parrish, appellee was asked and said:

"If you had known before you left home and made this trip to Paducah that Otis Clark or this man Parrish denied liability to you, would you have incurred this expense to come to Paducah? A. I don't think I would." Asked on cross-examination, "What conversation did you say you had with Mr. Parrish?" she replied: "He wanted to compromise with me and said he would pay the burial expenses if I had not been extravagant. I said, 'No; if you owe me anything you owe me one thousand dollars.' He need not buy me. Q. Was that all that occurred? A. No, that wasn't all. Q. Did he tell you why he could not pay you the full amount? A. He said that we had not paid in any money since October; that we were suspended. Q. Did he say that was the real reason why the policy could not be paid? A. Yes, sir. Q. Did you say that was before the proof of death was made out? A. I think it was. Q. Did Mr. Parrish name any amount in compromise? A. He said he would pay the burial expenses. He didn't name any amount. Q. Did he say anything about you making out proof of death? A. I don't remember. I can't say. Q. Did you ever have more than one conversation with Parrish? A. Not that I remember of. Q. That is the last that you ever heard from him? A. Yes, sir. Q. Is that the only trip you made to Paducah to meet Mr. Parrish or any other agent of the company? A. Yes, sir; I think so, since Mr. Walker's death. I don't remember of but one trip. Q. Please state if you made more than one trip to Paducah at the request of any of its agents about the adjustment

or settlement in any manner of this policy? A. I don't remember of but one trip. Q. How did you happen to make this trip? A. He wrote me to come. Q. Did you, before you arrived in Paducah, have any knowledge or information in any way that this company repudiated its contract with you or denied liability to you? A. I did not. Q. If you had known before leaving your home on that occasion that they denied liability, would you have come to Paducah and incurred this expense? A. I would not.''

It appears from this evidence, which furnished the basis of the instruction given, that a short time after the death of the insured, and before the League had definitely declined to pay the certificate, or any proofs of death had been furnished, or, indeed, anything had been done looking towards an adjustment of the matter, Otis Clark wrote to Mrs. Walker the letter of March 30th, and in response to this letter she came to Paducah for the purpose of seeing one of the chief officers of the League, and expended in making this trip about three dollars. At the time this visit to Paducah was made, there was, as stated, a dispute between Mrs. Walker and the local lodge as to whether the assessments due by her husband had been regularly paid, although it does not appear that previous to this time any definite action had been taken by the League to contest the certificate upon the ground that it had been forfeited by the failure to pay the dues. It may, however, be assumed that previous to the Paducah interview, the chief officers of the League had information that induced them to believe and they did believe the certificate had been forfeited; but, notwithstanding this, they were disposed to make some compromise and settlement of the matter, as appears from the offer made by Parrish to pay the burial expenses.

Coming now to apply to these facts the law of this case as we understand it, we find it laid down in May on Insurance, Vol. 2, Sections 497-513; Bacon on Benefit Societies, Vol. 2, Sections 420-437, and Cooley's Briefs on Insurance, Vol. 3, page 2658, that if an insurance company, with knowledge of facts vitiating the policy, enters into negotiation with the insured by which the company recognizes or treats the policy as still in force, or, by its acts, declarations or dealings, leads the insured to regard himself as protected by the policy, or, after

the loss has occurred, induces him or the beneficiary to incur trouble or expense in preparing proofs of loss, while withholding notice of the fact that it does not intend to pay the insurance, such acts, transactions or declarations will operate as a waiver of the forfeiture and estop the company from relying thereon as a defense to an action on the policy. Illustrative cases supporting generally this doctrine are: Viele v. Germania Ins. Co., 26 Ia., 9, 96 Am. Dec., 83; Lamberton v. Connecticut Fire Ins. Co., 39 Minn., 129, 1 L. R. A., 222; Astrich v. German-American Ins. Co., 131 Fed., 13; Agricultural Ins. Co. v. Potts, 55 New Jersey Law, 158, 39 Am. St. Rep., 637; Kidder v. Knight Templars' Company, 94 Wis., 538; Burnham v. Interstate Casualty Co., 117 Mich., 142; The Traders' Mutual Life Ins. Co. v. Johnson, 200 Ill., 359; Phoenix Ins. Co. v. Grove, 215 Ill., 299, 25 L. R. A. (N. S.), 1; Rundell & Hough v. Anchor Fire Ins. Co., 128 La., 575, 25 L. R. A. (N. S.), 20; Arnold v. American Ins. Co., 148 Cal., 660, 25 L. R. A. (N. S.), 6.

Generally speaking, however, the estoppel or waiver —and we use the terms interchangeably—has been applied to acts or declarations of the insurer during the life of the policy, or rather before the death of the insured or the loss of the property; although in a limited class of cases it has been extended to embrace acts or declarations occurring after the death of the insured or the destruction of the property. But, manifestly, there is and should be a marked difference between the effect, as a waiver, of acts or declarations of the insurer during the life of the policy and before the loss has occurred, and the effect of acts or declarations after the loss has occurred.

Before the loss occurs, the insured, if he had known of the vice in his policy, or the fact that it was forfeited by some act or omission of his, might have taken steps to cure the defect or relieve the forfeiture and thus protect himself against loss by either removing the condition that operated to forfeit his policy or secure other insurance. Under circumstances like this it can easily be understood why the courts, for the protection of the insured and to prevent the insurer from taking an unfair advantage, should hold that the insurer is estopped to set up forfeitures that would defeat a recovery on the policy after it had, by its conduct or declarations, in-

duced the insured to believe that his policy was valid, when in fact it knew it was not. The policy of the law is to require insurance companies to deal fairly and honestly with their customers, and so when a company knows that one of its customers has by some act or omission forfeited his policy, it will not be permitted, with this knowledge in its possession, to lull him into the security by its acts or declarations that his policy is in force, and then, when called upon to pay the insurance, seek to defeat a recovery upon the ground that the insured had forfeited the policy by doing or failing to do some of the things that it knew would work a forfeiture, while holding out to him by its conduct that it would not rely on any forfeiture.

But after the loss has occurred and the policy has been forfeited by some act or omission of the insured, without any conduct or declarations on the part of the company that would estop it from relying on the forfeiture, an entirely different situation is presented. The acts or omissions of the insured that forfeited the policy have been put beyond his power to remedy, and his right to remove the things that caused the forfeiture cannot be affected by any conduct of the company.

As, however, the right to declare a forfeiture after the loss is with the company, and it may or may not at its pleasure insist on the forfeiture, this right of election should be so exercised as not to subject the insured to unnecessary expense or trouble. And so if the company is in possession of facts that operate to work a forfeiture, and it intends to rely on these facts to defeat any recovery, it should not be allowed to put the insured to unnecessary expense and trouble by letting him rest under the belief that it does not intend to rely on the forfeiture; and if it does, its conduct will amount to a waiver of its rights to rely on the forfeiture. In other words, it will be treated as having made the election it had the right to make, not to rely on the forfeiture.

In nearly all the cases that have come under our notice holding that an insurance company, by its conduct after the loss had waived its right to rely on the forfeiture, the waiver grew out of its conduct in subjecting the insured to trouble and expense in preparing and submitting the proofs of loss at a time when it knew it did not intend to pay the policy. But we think the doctrine of waiver might well be extended to embrace other defi-

nite and affirmative acts or conduct of the insurer that subject the insured to loss or expense while acting under the reasonable belief, induced by the conduct of the insurer, that it intends to pay the policy.

Estoppels like this arise, as said by May on Insurance, Vol. 2, Section 507, "where the insurer, having knowledge of the facts to which he has a right to take exceptions, or which would constitute a defense against any claim under the policy, if he chose to avail himself of them, so bears himself thereafter in relation to the contract as fairly to lead the assured to believe that the insurer still recognizes the policy to be in force and to constitute for him a valid protection." In other words, to constitute a waiver after loss there must be a distinct recognition, by acts or declarations, of the validity of the policy, or an intention to abandon or not to insist on the forfeiture: Weed v. L. & F. Fire Ins. Co., 116 N. Y., 106; Putman Tool Co. v. Fitchburg Fire Ins. Co., 145 Mass., 265.

An illustrative case upon this subject is Phoenix Ins. Co. v. Stephenson, 78 Ky., 150. In that case the insured took out additional insurance on his property in violation of a clause that additional insurance without the consent of the company would be void. Upon the refusal of the company to pay the loss, the insured brought suit and insisted that the company had waived its right to rely on the forfeiture by requiring him, after it had notice of the other insurance, to make out and forward proofs of loss. In holding that under the facts the conduct of the company did not amount to a waiver or estop it from relying on the forfeiture, the court said:

"The act or conduct of the company, in order to operate as a waiver of its right to rely upon the breach as a release from liability, must be such that the insured might reasonably infer therefrom that the company did not mean to insist upon the forfeiture. The insured must have been misled to his prejudice, and if he is so misled by a reasonable and justifiable reliance upon the acts or conduct of the insurer, the waiver or estoppel attaches, whether it was so intended by the insurer or not. In general, to work an estoppel, the party against whom it is attempted to be used must be in possession of all the facts, and the party attempting to plead it must have relied upon the representation or conduct of

the party against whom the plea is interposed, and must thereby have been misled to his prejudice."

And further: "This is essentially unlike the case where, during the continuance of the risk, the insurer is notified, even orally, of other insurance, and yet gives no notice to the insured that the insurer considers the contract of insurance at an end on account of such breach on the part of the insured. In that instance, the insured might be authorized to consider such silence on the part of the insurer, especially if continued for any considerable time after such notice, as a waiver of the right to insist on the forfeiture. In such case the insured might, with plausibility, say that if you had, before my loss, notified me of your intention to insist upon the forfeiture, it would have been in my power to protect myself by other insurance, and as you have waited until the damage has resulted, being in full possession of all the facts, you ought not now be permitted to rely upon the forfeiture."

Coming now directly to the facts of the case in hand, did the League by requesting the appellee to come from her home in Graves County to Paducah, under the circumstances heretofore set out, waive its right to rely on the forfeiture? We think not.

At the time the letter of March 30th, was written there was plainly a dispute between Mrs. Walker and the local lodge as to whether the assessment due by her husband had been regularly paid. Up to this time nothing had been done by the League that could have induced Mrs. Walker to believe that the certificate was in force or that it intended to pay the insurance. Evidently the League desired, if it could be done, to adjust the matter amicably and save the expense of a law suit. With this object in view we assume the letter was written requesting the Paducah interview. There is not a suggestion in this letter that the League did not intend to rely on any defenses it might have to defeat the policy, nor could it have conveyed to Mrs. Walker the information that a settlement according to the terms of the policy would be made. And to hold under circumstances like these that an insurance company could not seek the compromise of a doubtful policy contract without subjecting itself to liability for the whole of the contract would be establishing a very unwise rule of law. A rule like this would oftentimes prevent a settlement that would give

to the insured much more than he could get at the end of a law suit, and we are not disposed to carry this doctrine of waiver to the extent of saying that no efforts to compromise can safely be made by a company without subjecting it to liability for the entire amount in dispute.

If the conduct of the insurer in this case is to be construed into a waiver of its right to rely on the forfeiture, then in no case could an insurance company seek an interview with the insured for the purpose of compromising a claim whether disputed or not without incurring liability for the whole amount in controversy.

We think an insurance company may make an honest effort to compromise a disputed policy claim, or even one that it believes has been forfeited by some conduct of the insured before the loss, for which it was in no wise responsible, without being prejudiced if it fails in the effort. Many times disputes arise between the insurer and the insured as to the validity of the policy, one contending that there is no liability, while the other insists on the payment of the full amount stipulated in the contract; and we can think of no good reason why the parties should not be permitted to meet and talk the matter over without prejudice to the rights of either. In a case like this, what difference should it make at whose suggestion the interview is had or who bears the expense of it? Why should the fact that the insurer invites the conference and the insured spends a few dollars and a little time going to the appointed place, prejudice the rights of the insurer? If efforts to compromise a claim like this are to estop the insurer from setting up valid defenses that it has, there is no reason why the insured, if he offered as a compromise to accept less than the amount of the policy, should not be also estopped by his election.

If, however, an insurance company, after a loss has occurred, with full knowledge of the fact that the policy has been forfeited, and while not intending to pay any part of it, puts the insured to the unnecessary expense and trouble of preparing proofs of loss, or subjects him to expense by other definite and affirmative acts or conduct which would reasonably lead him to believe that the policy contract was valid, it will not be permitted, after the proofs of loss have been furnished or the other requested requirements have been complied with, to de-

feat a recovery on the ground of the forfeiture that it knew existed when it requested the proofs of loss or committed the other acts, and this is as far as we are disposed to go on the subject of waiver after the loss has occurred.

For the reasons indicated, we think the evidence was not sufficient to justify the instruction given, and the judgment is reversed, with directions to proceed in conformity with this opinion.