ST. PAUL, J.
 

 This is a suit upon a life insurance policy, the pertinent clauses of which read as follows:
 

 “New York Life Insurance Company agrees to pay to Gail R., wife of the insured, Five Thousand Dollars, upon receipt of due proof of the death of James T. Webster, the insured; or double the face of this policy upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and such death occurred within sixty days after sustaining such injury.
 

 “This double indemnity benefit will not apply if the insured’s death resulted from self-destruction, whether sane or insane. * * *
 

 “In event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by- the company and no more.”
 

 The policy is dated June 11, 1920, and the insured died within the first two insurance years, to wit, on June 5, 1921.
 

 The beneficiary claims the double indemnity benefit on the ground that the death of the insured resulted solely from bodily injury caused by the
 
 accidental discharge of a pistol,
 
 and occurred within a few moments after sustaining such injury.
 

 The defense is that the insured
 
 committed suicide,
 
 and that defendant is liable for no more than the amount of the premiums received, to wit, $187.75; which amount it tendered to plaintiff.
 

 
 *863
 
 There was judgment below for plaintiff for
 
 the amount of the tender
 
 only; and plaintiff appeals.
 

 I.
 

 In Canal-Commercial Blr. v. Employers’ Liability Assurance Corporation, 99 So. 542, 155 La. 720, this court said:
 

 “The correct rule, and the one to which we prefer to adhere, is stated in Ruling Case Law, vol. 14, section 416, p. 1236 as follows: ‘ * * * While in an action on an accident policy the burden is on the plaintiff to show that death was caused by accident [in which connection see also Kling v. Accident Association, 29 So. 332, 104 La. 763], yet where it is doubtful from the evidence whether death was caused by an accident or by suicide, a presumption arises that an accident, and not suicide, was the cause of the death.’ And also at page 1237, section 417 of the same volume, we find this statement of the law, viz.: ‘The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption.’ ”
 

 To the same effect see Travelers’ Ins. Co. v. McConkey, 8 S. Ct. 1360, 127 U. S. 661, 32 L. Ed. 308, and the cases collected in Rose’s note to page 667 of the official report; also 1 Corpus Juris, 495, § 278, note 7.
 

 II.
 

 In Eckendorff v. Mutual Life Ins. Co., 97 So. 394, 154 La. 183, this court said:
 

 “When, in order to avoid liability on a policy issued by it, an insurance company relies on the defense that the insured committed suicide, the burden rests on the company to establish that the insured did commit suicide
 
 to the exclusion of every other reasonable hypothesis.”
 
 (Italics by the present writer.)
 

 To the same effect see Kohlman v. N. Y. Life Ins. Co., 92 So. 132, 151 La. 607; Valesi v. Mutual Life Ins. Co., 91 So. 818, 151 La. 405; Boynton v. Equitable Life Assur. Soc., 29 So. 490, 105 La. 202, 52 L. R. A. 687; Brignac v. Pacific Mut. Life Ins. Co., 36 So. 595, 112 La. 574, 66 L. R. A. 322; Leman v. Manhattan Life Ins. Co., 15 So. 388, 46 La. Ann. 1189, 24 L. R. A. 589, 49 Am. St. Rep. 348; Phillips v. La. Equitable Life Ins. Co., 26 La. Ann. 404, 21 Am. Rep. 549; Hastings v. Knights of Honor, 3 Orleans App. 337; Schlager v. Knights of Pythias, 1 Orleans App. 93. And see, also, Metropolitan Life Ins. Co. v. Be Vault’s Adm’x, 63 S. E. 982, 109 Va. 392, 17 Ann. Cas. 27, and authorities gathered in the note thereto at pages 32 to 39 of the last-mentioned volume. See, also, 37 Corpus Juris, 618, § 415, and 22 Corpus Juris, 95, § 35.
 

 III.
 

 On the other hand, “the defense of suicide to a suit on a life insurance policy is sustained where the facts and circumstances, proved exclude with reasonable certainty any hypothesis of death by any other means.” Von Buelow v. Life Ins. Co. of Virginia, 9 Orleans App. 143; Wolff v. Mutual Reserve Fund Life Association, 26 So. 89, 51 La. Ann. 1261; Kohlman v. N. Y. Life Ins. Co., 92 So. 132, 151 La. 607; Eckendorff v. Mutual Life Ins. Co., 97 So. 394, 154 La. 183; Sanchez v. Woodmen of the World, 13 Orleans App. 247. See, also, 37 Corpus Juris, 640, § 443.
 

 IV.
 

 It is therefore clear that in a suit on a life or'accident insurance policy, where the defense is that the deceased committed suicide, there is but one issue to be resolved, and that is:
 
 Do the facts and circumstances proved exclude with reasonable certainty any hypothesis of death by any other means?
 

 But that is a question of
 
 fact,
 
 because, like the question of what is the
 
 proximate cause
 
 of an injury,
 
 it is not a question of science or legal knowledge, but
 
 each case-must necessarily stand on its own particular facts and circumstances. And, if a proposition so self evident need derive any support from authority, we find it in Milwaukee, etc., Railway Co. v. Kellogg, 94 U. S. 469, 474 (24 L. Ed. 256), wherein the court said:
 

 “The true rule is, that what is the proximate .cause of an injury is ordinarily a question for
 
 *865
 
 the jury. It is not a question of science or of legal knowledge. It is to be determined as a
 
 fact,
 
 in view of the circumstances of fact attending it.”
 

 See, also, the authorities collected in Rose’s note to page 474 of the official report; and see Modern Woodmen Accident Ass’n v. Shryock, 74 N. W. 610, 54 Neb. 261, 39 L. R. A. 826.
 

 V.
 

 But it is apparent that, where each case stands on its own particular facts and circumstances, no one case can serve as a complete precedent for, and be decisive of, another, but can only serve as a guide, pointing out some general rule applicable to one or more of the circumstances to be found in the case then under consideration.
 

 Eor it is clear that no two such cases ever present
 
 all
 
 the same circumstances in each case. Thus, not to multiply instances, where outside of the realms of fiction would we find another case presenting
 
 all
 
 the circumstances in the Von Buelow Case, or in the Valesi Case, both supra? Of these two cases one was held to show
 
 suicide,
 
 the other to show
 
 accident;
 
 but, although the two eases present circumstances as far different as possible, yet the opinion in each ease concludes with one finding of fact which in each case seems to have been the
 
 ultima ratio decidendi.
 
 To that
 
 one last finding of fact
 
 we will revert later.
 

 VI.
 

 Necessarily, therefore, “where the defense is that the insured committed suicide, any legal evidence is admissible to throw light on the circumstances and causes of his death. * 's * ” 37 Corpus Juris, 630, § 432.
 

 And in the valuable note to Metropolitan Life Ins. Co. v. De Vault’s Adm’x, supra, in 17 Ann. Cas., at pages 32 to 39, we find an extensive and well arranged exposition of different circumstances to which courts attach weight in investigating whether a deceased came to his death by
 
 suicide
 
 or otherwise.
 

 Among these circumstances we find: (1) Physical circumstances attending death, such as time,‘place, means of death, position of body, nature of wound, and "the like; (2) preparations for death, statements, letters, and previous attempts at suicide; and (3) motive, if any, touching which attention should be paid to age and ’ health, habits, disposition and temperament, domestic and social relations, pecuniary circumstances, and the like.
 

 Which note, however, does not purport to exhaust the whole category of relevant circumstances, and,
 
 of course,
 
 does not even approach doing so.
 

 But touching
 
 motive generally,
 
 the note quotes from Kornig v. Western L. Indemnity Co., 112 N. W. 1039, 102 Minn. 31, as follows:
 

 “To the absence of adequate motive the courts have always attached the highest importance in this class of cases”
 
 (our italics),
 

 —and cites as tending to support this proposition Supreme Tent, etc., v. King, 142 F. 678, 73 C. C. A. 668; Modern Woodmen of America v. Kozak, 88 N. W. 248, 63 Neb. 154; Sebesta v. Sup. Court of Honor, 115 N. W. 300, 80 Neb. 760.
 

 VII.
 

 Of course, where the suicidal act is shown by
 
 direct evidence
 
 of eyewitnesses, or suicide note or declarations of intent, there is no need to resort to circumstantial evidence, and hence no need to lay special stress on motive; nor, perhaps, even where the physical conditions surrounding the death are such as to leave no possible room for doubt (although in such cases the evidence usually shows some motive). See N. Y. Life Ins. Co. v. Watters, 243 S. W. 831, 154 Ark. 569; to which we have been specially referred by defendant.
 

 But, where there is no direct evidence as to the suicidal act, and no suicide note or the
 
 *867
 
 like, and the other circumstantial evidence leaves the scale evenly balanced between
 
 suicide
 
 and
 
 accident,
 
 then the one final circumstance, which must turn the scale, is
 
 motive
 
 or
 
 lack of motive
 
 for the act, because—
 

 “If there be a doubt, the evidence being conflicting and nearly evenly balanced, whether the death was caused by suicide or accident, the presumption is- in favor of the accident. So where the evidence points equally or indifferently to accident or suicide, the theory of accident is adopted.” 4 Joyce on Insurance (2d Ed.) p. 4416, § 2640.
 

 The question of motive or lack of . motive was the
 
 one last question of fact
 
 to which the court turned in the Yon Buelow and Valesi Gases, to which we said we would revert.
 

 VIII.
 

 In the Von Buelow Case (9 Orleans App. 143) the deceased was of German descent, and said to have been of distinguished lineage. He seems to have married a colored woman, by whom he had three children, and with whom he was living in decent surroundings. The marriage was null (article 94, R. O. C., as amended by Act 54 of 1894); and on November 9, 1909, he and the woman were both charged with violating Act 87 of 1908, relative to concubinage' between whites and negroes. On November 14th he left his’home as usual. No one knew where he had gone. Three days later he was found
 
 dead,
 
 in a small abandoned closet on a remote part of the river front, in a sitting posture,, with a pistol wound in his right temple, and a pistol near him. The holes and cracks in the closet were stuffed with old pieces of cloth, and on the body was found a note dated the day of his disappearance, reading:
 

 “Please turn my body and property over to my wife, Mrs. E". W. Von Buelow, 613 Napoleon Avenue, City.”
 

 The authenticity of this note was disputed, and was established only by inference; hence the search for a motive.
 

 These ‘ circumstances all pointed most strongly to
 
 suicide.
 
 Nevertheless the district judge and the Court of Appeal both sought for a
 
 motive
 
 as their final ratio, decidendi, thus:
 

 “The motive for the act is found in the mortification he would suffer when his family and friends in Europe would learn that he had been arrested and was to be tried for, violating the laws of his adopted country; and in the mortification and ostracism by his friends here when they learned that he had been married and was living with a negro woman by whom he had three children, against the sentiment of almost the entire community, and in violation of the public policy and laws of the state.”
 

 The court called it suicide.
 

 In the Valesi Case, 91 So. 818, 151 La. 405, the deceased was an Italian of a good family in comfortable circumstances. He had a wife in Italy, with whom he was on good terms, and for whom he provided liberally. He was in New Orleans on a protracted mission for the Italian government during the World War, and was living bachelor fashion in one of the prominent hotels of that city. On the day of his death he entered the hotel between 3 and 4 o’clock in the morning, and his actions on entering were such as to indicate that his condition was not normal; that he was intoxicated. He went to his room on the seventh floor; undressed, called for ice water and telegraph blanks; wrote two telegrams, one asking for an extension of his furlough, which was about to expire, the other not given. He must then have locked his door and gone to his bed, which showed signs of having been used. He asked to be called at 7 o’clock.
 

 Some time before 7 o’clock he drew water for his bath, but did not use it. A few minutes before 7 o’clock the head porter, on his way to work, saw him fall from the window of his room to the street below, where he was instantly crushed to death. The deceased had raised the screen of the window, cast out some pieces of glass, torn up some papers, and thrown out the scraps, east out or
 
 *869
 
 dropped the photograph of a woman with whom he had been intimate, and with whom he had quarreled, made up, and then parted —all this being practically contemporaneous with the fatal plunge, which the porter described as follows:
 

 “I saw the body of a man come right to the window, and lays back (sic, meaning ‘lay hack’ or ‘lay his back’) on the window sill, and turn the legs over", and that is all. I watched him until he got to the second floor; I didn’t see him hit the banquette.”
 

 The stenographic note does not show a period after the word
 
 all,
 
 but that is necessary to the evident meaning of the description.
 

 The defendant claimed a
 
 motive
 
 in financial straits, and also in the break with the woman aforementioned. The court, however, did not find this borne out by the evidence, saying:
 

 “We think the proof fails to show sufficient motive for suicide.”
 

 And the court declared it
 
 an accident.
 
 •
 

 And so on,
 
 right along the line,
 
 thus:
 

 In the Sanchez Case (13 Orleans App. 247) the Court of Appeal found a suióide note and unmistakable evidence of a suicide pact. The only question was whether Sanchez had been killed by his paramour, who had afterwards killed herself, or vice versa. The court found that the evidence showed conclusively that Sanchez had first killed his paramour and then killed himself.
 

 In the Eckendorff Case, 154 La. 183, 97 So. 394 [involving a pistol shot wound in the right temple] the court, immediately after stating the nature of the ease and the defense set up, and before proceeding to the physical facts, said: “The determination of the case * * * involves an inquiry as to whether there was a motive for the suicide alleged,” and thereupon said: “We find a motive for the unfortunate act
 
 clearly established"
 
 [embezzlement and approaching detection]. It was declared a
 
 suicide.
 

 In the Kohlman Case, 92 So. 132, 151 La. 607 [involving carbolic acid drunk from a “tumbler,” filled from a bottle from which the label had been carefully removed, the deceased being found in his ofiice late in the evening after giving instruction that he was not to be disturbed], the court found a
 
 motive
 
 for the fatal act of the deceased in “his straightened financial circumstances, [and] the fair amount of insurance which he carried on his life” to provide for his family. It was declared a
 
 suicide.
 

 In the Wolff (Goldschmidt) Case, 26 So. 89, 51 La. Ann. 1261, there was
 
 direct evidence
 
 of an eyewitness that the deceased, after attempting to murder him (the witness) by shooting him twice in the head (once after he was down), had turned the pistol on himself. This witness was corroborated by another who heard all the shooting and saw the deceased with a pistol in his hand as he fell. Here the
 
 motive
 
 for suicide was apparent, as well as the
 
 fact.
 

 On the other hand, in the Schlager Case, 1 Orleans App. 93, the Court of Appeal found,
 
 in concluding,
 
 no financial or domestic or physical or mental conditions “sufficiently marked or serious to lead him (the deceased) to take his own life.” And, although the deceased “was found dead in his bedroom with a shotgun by his side, * * * about a foot from the head of the deceased,” the court declared it an
 
 accident.
 

 Thus also, in the Hastings Case, 3 Orleans App. 337, “the deceased was found dead in his bed, and on a table nearby was a corked two-ounce bottle of carbolic acid, two-thirds empty.” There were marks of acid burns on the chin and at the corner of the mouth, and the mouth smelled of carbolic acid. There was no other cause of death
 
 even suggested.
 
 The Court of Appeal found, however, that the deceased was in good health, of a jovial disposition, and had no domestic or financial difficulties; and then
 
 concluded:
 

 
 *871
 
 “There is no motive [shown] why any desire to destroy himself should have overcome Hastings’- [legally presumed] desire to live, and even assuming that carbolic acid was the cause of death, it is our deliberate conclusion that the proof
 
 does not reasonably exclude the hypothesis of death by aeoident.”
 

 The
 
 Phillips (Morse) Case, 26 La. Ann. 404, 21 Am. Rep. 549, was the first of its kind in this jurisdiction.'' The question was, What did the policy mean by “if he (the insured) should die by his own hand?” The court held that this meant any “voluntary self-destruction of the insured, by whatever means accomplished.” The defense contended that it meant “any suicide, and
 
 especially
 
 suicide superinduced by insanity.” The court held, however, that—
 

 “We do not believe the parties intended to exempt the risk that the insured might become insane and might, When in that state, commit suicide.”
 

 The court then found that the facts and circumstances did not point to the voluntary self-destruction of the insured. Thus:
 

 “All the facts and circumstances proved, in regard to his death, are that he retired to his room at bedtime, and about one o’clock at night the report of a pistol was heard. When the inmates of the house came to the room, the insured was found in a reclining posture on the sofa, and a pistol was lying on the floor nearby.
 
 He had been shot in the mouth.
 
 It is possible that he might have shot himself accidentally, or that an enemy might have found him sleeping with his mouth open and
 
 shot him in the mouth to avert suspicion.
 
 The evidence, being circumstantial only, proves nothing since it does not exclude all other reasonable hypothesis. But if that fact were established the plaintiff has proved that
 
 the deceased loas insane at the time of and before his death."-
 
 (Italics ours.)
 

 Very naturally, therefore, the question of
 
 motive ved non
 
 was not gone into, since the court had found that the clause in the policy excluding liability, “if the assured should die by his own hand,” did not cover suicide whilst insane. And, besides, “if the defendant were insane when he committed the act of self-destruction, no responsibility attached to his act,” so that it would therefore have been idle to look for any
 
 motive
 
 (i. e. moving cause) for committing suicide in the insane man other than
 
 the very fact that he was insane,
 
 and no court could possibly have been ignorant. of something so universally known.
 

 Hence, in this case, even with a
 
 motive
 
 staring „the court in the face, and with circumstances which (to say the least) pointed most strongly to
 
 suicide,
 
 nevertheless the court still found that suicide was not proved “to the exclusion of all other reasonable hypothesis.”
 

 This decision is undoubtedly correct under the alternative-reason given by the court (see 37 Corp. Jur. p. 551, § 301); and it is unnecessary to comment on the court’s finding as to the
 
 fact
 
 of suicide vel non. We have gone into the details only to' show that, even under the circumstances set forth, and with a
 
 motive
 
 apparent on the face of things, the court still found that the evidence did not exclude ■all other reasonable hypothesis as to the cause of death, but intentional self-destruction; our purpose here being, of course, to point out again ‘that every case of suicide vel non must stand on its own particular facts and circumstances, and that no one case can stand as a full precedent for another. And we now proceed to consider further the importance which this court has always attached to
 
 motive
 
 as bearing on the question of suicide or accident.
 

 In the Leman Case, 15 So. 388, 46 La. Ann. 1189, 24 L. R. A. 589, 49 Am. St. Rep. 348, the facts are thus stated by the court:
 

 “The body found with a wound from a gunshot causing death, the discharged pistol wedged, or as if it had been forced on the thumb of the right hand [so as to require force to remove it], the body reclining on the sofa as of one sleeping, the left arm rested on the breast, the right leg crossed on the left, the head in the usual position of one in repose, and * * * no evidence of any convulsive movement.
 
 *873
 
 * * * The question is whether these appearances point to suicide to the exclusion of any other cause. Why not, with equal potency, to accidental death or death by the hand of another?”
 

 Whereupon the court said:
 

 “In any consideration of the cause of the death, weight is due to the condition of the deceased in life, i. e., his domestic relations, his means, his health and the state of his mind. It is human experience that the motive prompting self-destruction is to be sought, and usually found, in domestic unhappiness, ill health, financial troubles or insanity. In this ease no such causes are exhibited by the record. * * * [And accordingly] there is no adequate basis to refer the death to the intentional act of the deceased.”
 

 The reasons for judgment may therefore be summed up in a few words: There was no motive shown for self-destruction; therefore there was no proof of suicide.
 

 In the Boynton Case, 29 So. 490, 105 La. 202, 52 L. R. A. 687, the deceased was killed right after breakfasting pleasantly with his family, and just a few minutes after he had gone into an adjoining room. He was found sitting in a straight, high-backed, armless chair, leaning back and unconscious. The gun with which he was killed was found lying across his leg. It was a “simple” single-barrel gun with which the deceased and his son were in the habit of shooting rats. The son had left it loaded the previous day, though it was not his habit to leave it loaded after using it. The thumb catch of the hammer was broken, and the son had some time prior tied a string around the hammer, by which it could be cocked. “The gun was a ‘trick gun,’ it seems, and required, as we understand it, some knowledge of its peculiarities to shoot it.”
 

 The court held that all this was not inconsistent with the possibility of accidental shooting.
 

 The defense, however, relied upon two alleged previous attempts at suicide by poison, wherein the deceased was reported to have said that he wanted to die because of- family trouble. “The testimony leads to the inference that his family troubles grew out of the conduct of his tw’o brothers, who were, a few months before his death, charged with larceny, and were forced to leave the state to avoid a criminal prosecution.”
 

 The court said:
 

 “ * * * The least intent to take one’s own life is of more moment and more serious than days and years passed without the least manifestation of suicidal intent. * * *
 
 But here these manifestations of an intent to commit the suicide are not established icith any degree of certainty.
 
 * * * While, as a self-respecting man, he was doubtless greatly annoyed by the charges brought against two of his brothers,
 
 that was not of itself enough to drive a man to extreme desperation.”
 
 (Italics ours.)
 

 The court further said:
 

 “We are informed that he was an active and industrious man, kind and\ affectionate to his children [his wife had died three years before], who, in return, felt the regard and affection due him. He was not annoyed by debt, or anything else which would have a tendency to embitter one’s life.”
 

 8o that here again we find the court searching for a motive, and, failing to find one, declaring it an
 
 accident.
 

 The Brignac Case, 36 go. 595, 112 La. 574, 66 L. R. A. 322, came before this court on certiorari to the Court of Appeal, Third Circuit. This court (on rehearing), after taking occasion to remark that the presumption against suicide might be overcome as well by circumstantial as by direct evidence, said:
 

 “ * * * We think the deceased came to his death by opium poisoning, but whether it was taken by himself is not shown, nor is it shown, if taken by himself, whether this was done for the purpose of producing death, or injudiciously and for the sake of obtaining relief of some kind.”
 

 But just a little above that the court had said:
 

 “The testimony adduced certainly discloses a number of suspicious circumstances tending to
 
 *875
 
 establish that the assured committed suicide, but matters were left enough in doubt on the subject to have
 
 warranted
 
 the court below [Court of Appeal] in discarding that theory.”
 

 And since the paragraph which we first quoted indicates no
 
 “suspicious circumstances"
 
 whatever, we must go to the opinion of the Court of Appeal to determine what were the circumstances which this court considered suspicious, and why the matter was left in doubt.
 

 We quote from that opinion as follows:
 

 “In reference to the theory of suicide advanced by the company, the evidence shows that at one time the deceased was a prosperous farmer, but of late years
 
 had lost most of his property.
 
 That upon his return from Lafayette, not long before his death, he had expressed himself as being
 
 discouraged.
 
 That
 
 in the community where he lived there were rumors that he had forged another’s name to a note. It does not appear, however, that he had ever heen threatened with prosecution for this rumored offense. *
 
 * * It will be noted also in connection with the theory of suicide that there is no evidence whatever showing that the deceased at any time before his death made any declarations, or manifested by his acts or conduct the remotest indication [of any intention] to take his life; nor was there any evidence of opium about his person or in his room when he was discovered in a comatose condition. It will be noted, also, that he was found in that condition in the daytime, when anything unusual in his conduct or manner could have been easily detected as indicating his purpose to take his life, if such had heen the ease. The evidence shows that he was sick at the time and was suffering from the grippe. It may he that he took the drug to relieve pain, and by mistake took an overdose, causing his death.” (Italics ours.)
 

 Again
 
 no motive
 
 sufficiently shown.
 

 The Canal-Commercial (Favrot) Case, 99 So. 542, 155 La. 720. was a suit upon an
 
 accident
 
 policy; the question was whether the deceased came to his death through natural causes, or through “accidental and external means”; suicide whether sane or insane not being covered by the policy.
 

 The court found that the death of the insured was not'brought about by natural causes, but by gas asphyxiation (covered by the policy). He was found in the bathroom of his residence lying face down on the floor, the room being highly charged with gas from a rubber tube which had become detached from a gas stove, “with decedent’s nose and month in the.general direction of the detached end of the rubber tube.” The court found that the death was-
 
 accidental,
 
 not intentional, saying: “So far as the record discloses there was an entire absence of
 
 motive
 
 which would have caused the decedent to take his own life”; the court finding that he was prosperous, happily married, fond of his children, owning his own home amid excellent social surroundings, and without pecuniary embarrassments. So that here again we have
 
 no motive shown,
 
 and therefore no proof of suicide.
 

 IX.
 

 In the paragraph just closed we have analyzed and discussed
 
 every case
 
 of alleged suicide coming up in this jurisdiction, so far as they have been pointed out to us, and so far as we have heen able to find them by our own researches.
 

 The general purport of those decisions is that, while all other circumstances are to he considered, nevertheless
 
 motive
 
 is not alone one of many
 
 minor
 
 circumstances to be considered along with others, but is of itself the one
 
 major circumstance
 
 and prime consideration on which the whole case generally hinges.
 

 And while we do not purpose to examine all the jurisprudence of all the' states, we have no doubt that the result will not be found any different in other jurisdictions. For instance, we find .stress laid on
 
 motive
 
 in Green v. N. Y. Life Ins. Co., 182 N. W. 808, 192 Iowa, 32, and in N. Y. Life Ins. Co. v. Bradshaw (5th C. C. A.) 2 F.(2d) 457, to which we have been specially referred by defendant.
 

 We have already quoted (in paragraph VI, above) from the note in 17 Ann. Gas. 32 to
 
 *877
 
 39, as
 
 to the weight which
 
 courts attach to motive generally in cases such as this. And we now quote again:
 

 “Where Proof Shows Death by Act of Insured.
 
 * * * According to the weight of authority there is a presumption against suicide even where the circumstances point with certainty to tire conclusion that the insured killed himself. In such a case, where there is nothing from which it can be determined whether the act producing death was accidental or intentional, the presumption is that it was accidental. Grand Lodge, etc., v. Banister, 96 S. W. 742, 80 Ark. 195; Guardian Mut. L. Ins. Co. v. Hogan, 80 Ill. 42, 22 Am. Rep. 180; Supreme Court of Honor v. Barker, 96 Ill. App. 490; Knights Templars, etc., L. Indemnity Co. v. Crayton, 110 Ill. App. 657, affirmed 70 N. E. 1066, 209 Ill. 550; Van Norman v. Modern Brotherhood of America, 111 N. W. 992, 134 Iowa, 580; Mutual L. Ins. Co. v. Wiswell, 44 P. 996, 56 Kan. 765, 35 L. R. A. 258; Masonic L. Ass’n v. Pollard, 89 S. W. 219, 121 Ky. 353, 123 Am. St. Rep. 198; Lindahl v. Supreme Court, etc., 110 N. W. 35S, 100 Minn. 87, 8 L. R. A. (N. S.) 916, 117 Am. St. Rep. 666; Thaxton v. Metropolitan L. Ins. Co., 55 S. E. 419, 143 N. C. 33; Brown v. Sun L. Ins. Co. (Tenn. [Ch. App.]) 57 S. W. 415, 51 L. R. A. 252.”
 

 X.
 

 We have shown, we think, that, in inquiring into the alleged suicide of a person deemed sane, where there is no direct evidence, as of eyewitnesses, suicide notes, or previous declarations, the physical surroundings, which almost always leave room for doubt as to
 
 accident
 
 or
 
 suicide,
 
 must be subordinated to the evidence as to
 
 motive.
 
 The reason is that, although the physical evidence may show unmistakably that the deceased killed himself, nevertheless it does not usually show with the same certainty whether he did so
 
 intentionally
 
 or
 
 unintentionally,
 
 and hence that fact must be ascertained by inquiring whether the deceased had or had not some strong motive for taking his own life. In other words, the physical facts tend principally to show whether or not the deceased died by his own hand; whilst the evidence as to
 
 motive
 
 bears principally on the intent of the deceased at the time he killed himself. If the deceased had no strong motive for taking his own life, the presumption would be that he did so accidentally; on the other hand, if he
 
 did
 
 have some strong motive for doing so, the inference naturally is that he did so
 
 intentionally.
 

 In short, this is so manifest to every one that counsel for defendant, after arguing that the (physical) circumstances of this killing are so clear and convincing that a consideration of these alone is sufficient to compel a judgment for defendant, say in their brief (page 17):
 

 “But, in cases of this hind, the mind naturally inquires if there was a motive.”
 
 (Italics ours.)
 

 XI.
 

 Of course, as we have already suggested, “the presumption against suicide does not exist where it appears that the insured was insane.” Note in 17 Ann. Oas. 33, citing Mut. Ben. Life Ins. Co. v. Daviess, 9 S. W. 812, 87 Ky. 541; Wasey v. Traveler’s Ins. Co., 85 N. W. 459, 126 Mich. 119; Germain v. Brooklyn Life Ins. Co., 26 Hun (N. Y.) 604; Id., 30 Hun (N. Y.) 535. Where a man is afflicted with frenzy, or melancholia, or suicidal mania, or the like, “it is to do violence to the facts to say of a man thus afflicted that there is nevertheless a presumption that he did not do the thing which men in his state usually or commonly feel impelled to do.” Wasey v. Traveler’s Ins. Co., supra.
 

 XII.
 

 Likewise, where there is a suicide note or clear evidence of unequivocal declarations of intention to commit suicide, there is no presumption against suicide, and therefore no reason to seek a motive (though in such cases a motive is usually
 
 obtrusively manifest,
 
 and generally appears in the very suicide note or declarations of suicidal intent). See the Von Buelow, Boynton and Sanchez Cases, supra.
 

 
 *879
 
 XIII.
 

 Likewise also, where there are eyewitnesses to the fatal act, or where the means employed or manner of death leave no room for doubt that the deceased sought his own death, the presumption is overcome by the fact, and hence there is no reason to seek a motive, as where the deceased has hanged himself by the neck, or retired to some remote and unusual place, carrying with him the instrument or other means of death, and for which he could have had no other need at such place than to take his own life. See the Wolft (Goldschmidt), Kohlman, Eckendorff, Von Buelow, and Sanchez Gases, supra.
 

 XIV.
 

 Likewise again, where the deceased kills himself immediately after committing or attempting (with near success) a homicide on another, or whilst fleeing pursuit after the commission of some high crime, the presumption against suicide is overcome, because the motive is self-evident. See the Wolff (Goldschmidt) Case, supra.
 

 XV.
 

 But in the ease before us we have none of the circumstances mentioned in the last four paragraphs above. The deceased was admittedly
 
 sane.
 
 There was no eyewitness; the manner of his death was not such as to show
 
 necessarily
 
 that he sought his own death; he had not committed
 
 or even attempted
 
 a homicide, but only (at the worst)
 
 threatened
 
 a homicide, and was not fleeing pursuit; there was no suicide note or previous declaration of intention to take his own life—as to which there is not one scintilla of evidence in the record but the following:
 

 While G. G. Ridenbaugh, a witness for defendant, was under examination by defendant’s counsel; he testified as follows:
 

 “Question:
 
 I want to take your memory back to March, 1921, some three months before Mr. Webster died. * * * On that occasion, Mr. Webster, while in your company, threatened to kill himself, did he not?
 

 “Ansioer:
 
 Not that I remember.
 

 “Question:
 
 You remember having told Mr.
 

 Harold Stewart [who was not a witness in this case] that he did so?
 

 “Answer:
 
 No, sir.”
 

 Here the manifestations of an intent to commit suicide are not only “not established with any degree of certainty,” but
 
 not established at all.
 
 See the Boynton Case, supra, par. VIII.
 

 XVI.
 

 And since it is evident from the testimony, and undisputed that the insured
 
 hilled himself,
 
 whether accidentally or intentionally, it follows that this case presents only two issues,
 
 both of, fact,
 
 to wit: Do the physical facts surrounding the death of the insured exclude with reasonable certainty any possibility of
 
 accident?
 
 and,
 
 if not,
 
 Does the evidence show that the insured had such sufficient motive for taking his own life as would overcome the presumption against suicide, and make it reasonably certain that his death was not the result of accident, but of his own deliberate intention to take his own life?
 

 XVII.
 

 In this jurisdiction all appeals in civil cases come up on both the law and the facts. Our present Constitution provides that all transcripts shall be read by at least two judges and a conclusion reached in consultation before the case is assigned, for writing the opinion. By legislative act it is provided that the whole testimony, taken stenographieally in the court below, shall be brought up in the original. The Constitution further provides that the judges of all courts shall refer to the law and adduce the reasons on which their every final judgment is based.
 

 This is the only apology which we can offer for inflicting on the counsel and litigants in this case and on the bar generally the lengthy and perhaps rambling dissertation on
 
 *881
 
 law which has preceded, and the perhaps even .more lengthy and rambling review of the evidence which must follow.
 

 We cannot hope that an opinion on intricate questions of law and of fact, written under the pressure for time with which this court is always confronted, will rank as a legal classic, or prove convincing either to the litigants or to the members of the profession. The most that we can do is to assign such reasons as appear
 
 to us
 
 to justify our conclusions whether of law or of fact, and let these stand for whát they may be worth; taking care only that we set forth our reasons openly and fully, for such criticism and approval or disapproval as they may merit.
 

 Had this case been tried before a jury as final arbiters of the facts, it would have sufficed to charge such jury with the two propositions of law laid down in paragraphs II and III above; leaving it to counsel to point out to the jury those circumstances which each might think applicable to the case and favorable to that side which he is seeking to uphold; and the broad chances are that, however the verdict might have gone, that verdict would never have been set aside by an appellate court having jurisdiction only as to the law of the case.
 

 For the
 
 law
 
 of the ease presents
 
 no difficulty
 
 whatever, and, as to
 
 that,
 
 counsel neither can nor
 
 do
 
 differ. They differ only as.to what
 
 facts
 
 are shown by the evidence, and what deductions are to be drawn from the facts as each claims them to be. Counsel for the plaintiff argues that the facts, as
 
 he
 
 finds them from the evidence, do
 
 not
 
 exclude the possibility of the shooting having occurred accidentally, and do
 
 not
 
 show that the deceased had any motive for taking his own life. On the other hand, counsel for defendant urges that the facts as
 
 he
 
 finds them
 
 do
 
 exclude the possibility of accident, and that the deceased
 
 had
 
 a motive sufficient to induce him to take his own life.
 

 A jury would have heard the evidence attentively, followed closely the argument of the learned counsel, heard the simple and sufficient charge of the judge, and retired to consider its verdict. It would then have considered and agreed that the facts, which
 
 it
 
 (the jury) found from the evidence,
 
 did or did not
 
 reasonably exclude all possibility of accident; and, if the jury agreed that the facts as found by them did
 
 not
 
 reasonably exclude the possibility of accident, it would then have considered whether the evidence
 
 showed, or failed to show,
 
 to their satisfaction, that the insured had some sufficient motive for taking his own life. And a verdict would then have been reached and handed down accordingly.
 

 With us the very same process must be followed—with this difference only, that
 
 we
 
 must set forth our findings of fact in extenso, so as to bring out each single circumstance on which each counsel relies, and give written reasons for each such finding of fact. This necessarily means the co-ordination of a multitude of small circumstances to show their bearing on the main fact at issue; there being, indeed, no serious dispute as to the veracity of any witness, no conflict of testimony, and no serious controversy over any one particular circumstance, but only as to what conclusions are to be reached from the combination of all these practically undisputed circumstances,
 
 not
 
 as a matter of
 
 law,
 
 but as a conclusion of
 
 fact.
 
 The
 
 precedents
 
 which we have gathered together in the foregoing párt of this opinion can therefore serve only as a very general, and somewhat loose, guide in that process of co-ordination.
 

 XVIII.
 

 We take up first the question whether or not the circumstances under which the deceased met his death reasonably exclude the possibility of accident, mentioning
 
 only incidentally,
 
 as we go along, the age, health, habits, disposition, temperament, domestic
 
 *883
 
 and social relations, pecuniary circumstances generally, and the like, of the deceased, for it is in none of these that the defendant seeks to point out a motive, but only in another alleged condition of his pecuniary affairs, to which we shall revert later on.
 

 . The deceased, James T. Webster, who was usually called by his middle name of “Theo,” was between 30 and 31 years of age at the time of his death, Sunday, June 5, 1921. About 3 years before he had married Oail Russell, the plaintiff here, whom he had known 2 years before he married her. The young couple went to live with the wife’s family—father, mother, and brother. They lived thus until April 5, 1921, when the deceased bought a home in a nice neighborhood, to which he removed with his wife, and in which they had been living only 2 months when he died.
 

 His relations with his wife’s family were pleasant. He was also on good terms with his own family, and friendly with his neighbors. His disposition was cheerful; apparently he did not gamble; and he spent his nights at home.
 

 He drank some, but not to any great excess. Sometimes, though not often, he came home somewhat under the influence of drink; and then his wife “didn’t
 
 quarrel,
 
 but used to say something about it, * * * because I (she) don’t believe in drinking.”
 

 Webster and his wife were happy in their marriage; “they got along perfectly.” They had one child, a boy then about 19 months old, who went by the pet-name of “Sonny-boy,” and of whom the father was “very fond”; even “crazy about him” ; and the wife was by way of soon giving birth to another child.
 

 During the time the young couple lived with the wife’s parents, that is, until they moved into their own home, which was just 2 months before the husband died, they paid only $30 per month for board, and had no other expenses; “we saved our money.” During the two months they lived in their own home they had only one servant of all work, to whom they paid $6.50 per week. According ' to the wife, they lived very modestly even then; but, according to Webster’s employer (who figures hereafter in this ease), he lived so extravagantly that the latter had already grown suspicious of him some 4 months or more before he died, or 2 months before he moved from his father-in-law’s house into his own home.
 

 For 6 or 8 years (except 10 months spent in the army) the deceased had been in the employ of J. B. Blogan, who, under the name of the Home Furniture Company, did an installment business in furniture, etc. Blogan had one
 
 outside man,
 
 a collector. The
 
 inside
 
 men were Blogan himself and Webster, who was his bookkeeper. Webster was a “very valuable” man; almost indispensable'to Blogan.
 

 When he married, Webster’s salary was $130 per month. It was raised to $200 per month for the year 1920. On January 1, 1921, it was again raised to $250 per month, where it re.mained until his death in June following. Employer and employee were always on the most friendly terms, except that during the last few months the emifloyer suspected his employee of robbing him, but
 
 said
 
 nothing about it to him.
 

 On Sunday morning, June 5, 1921, just after breakfast, which was usually about 9 o’clock, Webster took his little boy with him in his automobile and went to the store of Jones & McCan to meet two intimate friends. They remained together about three-quarters of an hour, and Webster had
 
 several drinks.
 
 He then went off in his automobile, accompanied only by his little son. He appeared to be
 
 soher
 
 when he left; but, as neither the time of his arrival nor that of his departure is fixed, the record does not show how much time elapsed between such departure and the time when he reached his home, which was
 
 *885
 
 between 12 and 12:30 p. m., nor does it show what he did during that time.
 

 When he reached home, “he was [appeared to his wife to be] under the influence of liquor. Couldn’t stand up”; intoxicated as he had never been before.
 

 Tlie wife’s account continues as follows:
 

 “I got up—I was sick—and put the dinner on the table; and after I put it on I went out on the [front] porch and sat in the swing with the baby. And the baby wanted to go riding again, and I told him, ‘No, let’s stay here.’ And the baby kept crying to go riding, But I knew that my husband wasn’t in any condition to take the baby, and that is the reason I didn’t want him to go. And while I was sitting in the swing my husband went into the back of the house, and then came to the door [the next-door neighbor says, “He came to the door several times whilst I was talking to her”], and told me he wanted to take the baby for a little ride, and I told him,- ‘No.’ So he went back in the dining room, and when he got there he fell, and went to the back part of the house, and I heard him holler, and ran to the back room. He was sitting idnd of sideways, and couldn’t get his clothes off, and couldn’t do anything, seemed to be crazy like, and I had never seen him act like, that before; and so he fell across the bed, and then got up again, * * * and was going towards the clothes closet, and I asked him what he wanted, and he said, ‘Nothing,’ and fell on his back; and I was holding the baby, and the baby was crying, and he said, T am going to kill the baby,’ and then I ran next door, and I heard a shot fired. * * * I was standing on the steps next door [when she heard the shot fired].”
 

 The flight to her neighbor’s occurred about one-half or three-quarters of an hour after Webster reached home; making it about 1 o’clock or a little after.
 

 She left her own house by the rear, and ran with her baby to the back door of her neighbor, calling her, “Oh, Mrs. Hamilton.” She came into Mrs. Hamilton’s kitchen, telling her, “Theo wants to kill Sonny-boy,” and that her husband was “drunk.”
 

 Mrs. Hamilton became very much excited, and, taking the child from its mother, she ran with it to her own next-door neighbor, Mr. Cummings.
 

 Mr. Cummings was prevented [we think erroneously, since it was all one continuous occurrence] from telling what Mrs. Hamilton said to him; but it must have been something alarming, for “I started to run over to the house, and my wife asked me where I was going, and I told her to Webster’s home; and she asked me not to, and started crying, and begged me not to go, and I stayed; and then she insisted that I lock the front door, and I locked the front door; and finally I decided that the best-thing to do was to call the police.”
 

 Accordingly Mr. Cummings telephoned the police, who arrived by automobile “not over 5 or 10 minutes” later.
 

 Plaintiff had remained at the home of Mrs. Hamilton whilst the latter ran with the baby to Mrs. Cummings. The evidence does not show whether Mrs. Hamilton and the Cummingses heard the pistol shot.
 

 When Mrs. Hamilton returned to her own home, plaintiff had telephoned to her mother, and was standing on Mrs. Hamilton’s front lawn, or front gallery, when the police arrived.
 

 Mrs. Webster’s mother, on receiving her daughter’s message (the nature of which does not appear from the evidence) telephoned at once to her son, Harry Russell, plaintiff’s brother. The latter came immediately, arriving within 5 minutes, and practically at the same time as the police.
 

 When the police first arrived, they went to Mr. Cummings, who told them that he had the baby, and that plaintiff was next door (at Mrs. Hamilton’s). Whereupon Police Lieutenant Allen testifies:
 

 “Mrs. Webster and another lady [Mrs. Hamilton] and Mr. Russell showed up at the same time as myself--and Mr. Standifer [police patrolman] ; and Mr. Russell asked her what was the trouble, and she told him that Mr. Webster was acting strange, and that she had moved the baby next door, and told us to be careful because he has a gun. * * * She said that she had sent the baby next door to keep the baby
 
 *887
 
 from getting killed, * * * and cautioned us to be particular because Mr. Webster had a gun, and she didn’t want us to get hurt. * * * ‘Threatened to kill the baby’—that is what she said. * * * Said she heard the report of the gun one time when she had run out, * * * and cautioned us to be particular.”
 

 The testimony of Patrolman Standifer and of Harry Russell is substantially the same, except that the patrolman says that she said Mr. Webster was “drunk,” and Mr. Russell does not remember that she said he had threatened to kill the baby, though “she may have, but, if she did, I don’t remember it, because the moment she said he had already shot once I immediately ran in the house to see what I could do.”
 

 We have given these minute details as to plaintiff’s cautioning the police and her brother to be careful merely for what they may be worth in connection with the suggestion that plaintiff knew that her husband had killed himself. For plaintiff denies that such was the fact, and she must be far more nimble-witted and callous-hearted than her testimony as a whole shows her to be to have thus quickly thought of the life insurance carried by her husband and remembered at once the details of the suicide clauses therein; shamming so shamefully, not only as to the need for caution, but also as to the supposed danger for her baby,
 
 knowing all along that her husband was dead.
 

 Mr. Russell ran at once to the house of his brother-in-law, followed closely by Lieutenant Allen and Patrolman Standifer, calling him by name aloud several times as he entered. They went through the front door, through the hall, through the dining room, and into the bedroom.
 

 There they found Webster in his
 
 underclothing
 
 and bare feet, sitting on a cane-bottomed stool which stood between a “dressing table” or “dresser” and the foot of the bed; his body lying back on the bed, with his right hand on his right leg, near a pistol, which lay on the stool between his legs.
 

 He was “bleeding from the mouth,” and the coroner found a bullet wound in his right temple, but
 
 “no powder marks."
 
 Judging “from the wound and the course of the bullet,” the coroner “would say that he shot himself with the revolver”; but he was very properly not allowed to answer
 
 plaintiff’s
 
 counsel as to whether he thought the wound was accidental or intentionally inflicted. The coroner’s official finding was “suicide.”
 

 As Mr. Russell saw the body of his brother-in-law, he éxelaimed, “Oh, my God, he is dead”; or he has “shot” or “killed” himself, or he has “committed suicide.” He says he thinks he said the first. The police say they think he said the last, or “something of the kind.”
 

 His exclamation at the time, whatever it was, was good evidence of what he
 
 thought
 
 at the time. But his
 
 opinion,
 
 whether at that time or at any other, is of no value whatsoever as to whether the death was an
 
 aeoident
 
 or
 
 suicide,
 
 for even'the formal report of a coroner’s jury is at best but the weakest kind of evidence. Leman v. Life Ins. Co., 15 So. 388, 46 La. Ann. 1189, 24 L. R. A. 589, 49 Am. St. Rep. 348; and, “by the weight of authority, however, while such verdict is competent to be received in evidence as part of the proof that the death occurred, it is not even prima facie competent as tending to prove the cause of such death; and this is true when it is introduced by either party.” 13 Corpus Juris, p. 1256; 37 Coin pus Juris, p. 633, § 436. See, also, text and note 13, page 634.
 

 Nor is there any significance in the fact that there was a
 
 looking glass
 
 to the dressing table or dresser .in front of which the deceased was sitting at the time of his death. Neither Eckendorff nor Goldschmidt (Wolff Case) nor Von Buelow nor Sanchez found a looking glass necessary for their fatal purpose.
 

 But what
 
 is
 
 of some significance is that
 
 *889
 
 the dressing table or dresser had at least one
 
 drawer,
 
 a drawer in which the pistol was usually kept; and the fact that the deceased, when last seen alive, was undressing and going towards the clothes closet, as if looking for something, and, when next seen was in his underclothing, seated in front of the dresser with a .drawer to it. Nightclothes are sometimes hung up in a clothes closet if not so soiled as -not to be used again, and one who had hung up his nightclothes in a closet in the morning might very naturally, on not finding them, look for fresh clothes in the drawer of his dresser. Nor is it unreasonable to imagine that a drunken man might be seeking to get into bed around midday. [The evidence does not show whether the pistol was usually kept loaded.]
 

 Why a drunken man should pick up a pistol lying in a drawer no one could say; no more than one could say why a drunken man should threaten to kill his only baby, about whom he was “crazy,” because his wife refused to let him take the baby for an automobile ride, for “that was not of itself enough to drive a man to extreme desperation.” And, for the rest, “the freaks of a gun [or pistol] when not carefully handled [even by a sober man] are sometimes wonderful.” Boynton v. Equitable Life Assurance Society, 29 So. 490, 491, 105 La. 202, 204 (52 L. R. A. 687). How much more
 
 wonderful
 
 may not such freaks be, when the gun is handled by a drunken man?
 

 Our conclusion is that the physical facts and circumstances of this case do not exclude with reasonable certainty the possibility of
 
 accident.
 
 Compare with the Boynton, Le-man, Phillips (Morse), and Schlager Cases; also with the Yalesi, Brignac, Canal-Commercial (Pavrot), and Hastings Cases; all supra.
 

 XIX.
 

 We think that the deceased was drunk,
 
 very drunlc,
 
 “acting crazy”; “acting strange.” His wife swears he was. She said so at the time to Mrs. Hamilton and to the police. Mrs'. Hamilton says he came “several times” to the door in the “15 or 20 minutes” that she was speaking to plaintiff on her front porch. He had had “several drinks” with his friends before starting for home; and the evidence shows neither how long a time elapsed between the time he left his friends and the time he reached home, nor what he was doing in that time; and even “several drinks” of the vile stuff which is being bootlegged around is enough to make any man very drunk and “act crazy”; “act strange.”
 

 Now the days of drunken men are not so far removed in the past that persons of ordinary experience and observation do not remember that the mind of a drunken man becomes a “one-track mind,” imbued with only one single idea at the time, whatever that may be, from which it cannot be shaken, and around which it continually revolves, ad nauseam.
 

 Webster wanted to take his little boy automobile riding; possibly because the child, of whom he was “crazy” fond, wanted to go, and his own inflamed mind could not see the danger thereof as his wife saw it. He may'' have been angered, after the fashion of a drunken man, because he was crossed in his •wish by the unwillingness of his wife to trust the child to him; and he may have threatened to
 
 Mil the child
 
 rather than not have him, after the manner of the false mother before Solomon, for experience teaches us that a drunken parent has not always the same instincts as a sober parent. Or he may have made the threat with a drunken man’s purpose to force his wife to comply with his wishes out of -fear for the consequences of her refusal.
 
 We do not lenow,
 
 and Webster is not here to tell us, even if he himself had any clear idea of what his own purpose was, and we doubt that he had any
 
 *891
 
 such clear idea of what he meant by his unnatural threat. There is no presumption that such a threat was meant seriously, and there is no proof in the record that it was. His wife says (or is made to say, by her counsel) on rebuttal, that she “did not honestly believe that Mr. Webster intended to kill your [her] baby,” and merely “was not taking chances with a drunken man.”
 

 Webster had therefore in his mind the one fixed idea of taking his baby riding, and that his wife was preventing him from carrying out his purpose.
 

 And, being intoxicated, he naturally
 
 felt the physical discomfort
 
 which any other sick animal would have felt, for intoxication is
 
 siclcness.
 
 We are not here arguing that the habit of getting intoxicated is a disease; we are merely stating the fact that an intoxicated man is at the moment suffering from a derangement of his normal physical condition. In that sense Webster was
 
 sick,
 
 and could not but feel the physical discomfort attendant on such a condition.
 

 That was
 
 a mere physical sensation,
 
 and was not inconsistent with what was uppermost and alone
 
 in his mind;
 
 and he may
 
 instinctively
 
 have sought for relief in sleep or in lying down; undressing and looking for his nightclothes from sheer force of habit. He may not have known, or may not have cared, whether it was midday or midnight, for he “seemed to be crazy like.” All this we know nothing about; but it is an “hypothesis” which is not
 
 excluded
 
 by the physical facts and circumstances of this case.
 

 But the point which we
 
 mean to emphasize
 
 is that Webster, obsessed as he was, until the very moment that his wife fled, with the idea of taking the baby riding, against his wife’s opposition, had at that time
 
 no room in his drunken head
 
 for any remorse over robbing his employer, if he did so, or for fear of detection, if there were any, and had
 
 no time to become worked up to the point of desperation
 
 over any such thought!., even if they came to him, in the few moments which elapsed between the flight of his wife and the discharge of the fatal shot.
 

 Hence there is
 
 more than room for doubt
 
 that- he was actuated by any such motive. And the burden of proof was on
 
 defendant to
 
 show motive, if motive was essential to overcome the presumption in favor of accident, and establish suicide, for suicide is an affirmative defense, and the burden of proof is on the defendant to show it. Supreme Tent K. M. v. Stensland, 68 N. E. 1098, 206 IU. 124, 99 Am. St. Rep. 187.
 

 XX.
 

 But the evidence does not even show that Webster was robbing his employer, although it does not establish'
 
 affirmatively
 
 the contrary. True, it shows that Webster was handling through his bank account more money than came to him by way of salary from Blogan, his employer; and the evidence does not show satisfactorily where he got it or how he spent it—whether it was a mere “turnover,” the same money going out and coming back in the way of business, or stolr en money coming in and squandered in luxuries or dissipation.
 

 Webster is not here to tell us where the money came from or where it went. In this we have only his bank account to guide us, to which we will revert later. But we cannot
 
 presume
 
 that he was a thief; and the inquiry must be
 
 whether it is shown
 
 that he was. But we do , know that he occasionally bought and resold second-hand automobiles. How often, we do not know. There is proof that he bought and resold one “Marmon” car, and “made a good deal of money on it,” but the amount is not shown, and that on this or another occasion “I believe he said he made $450.” His employer says: “He did occasionally buy and sell an automobile. He told me so on several occasions”; and, also: “I think Mr. Webster had been accus
 
 *893
 
 tomed to
 
 loaning money,
 
 just little accommodation loans. * * * ” And plaintiff testifies :
 

 “After his (Mr. Webster’s) death, he (Mr. Blogan) phoned me to come down, stating that he had
 
 a note for me that some one owed Mr. Webster,
 
 and phoned me to come down and get it.”
 

 So it is not impossible that Webster made some money outside of his salary, nor is it impossible that the money going out and coming in through his bank account may have been only a turnover of the same money.
 

 Webster kept his bank account in the same bank as his employer, for he was invariably paid his salary by check, and, although it does not always appear from his deposit slips on what bank these checks were drawn, it does appear that his salary checks for August and October were drawn on the Commercial National Bank of Shreveport, where Webster kept his own account.
 

 And it would be highly imprudent, and therefore not wholly probable, that a dishonest employee should keep his ill-gotten gains in the same bank with which his employer did business, and where the latter could, and (as the result shows)
 
 did,
 
 get information about the employee’s account, and keep watch over it.
 

 Mr. Blogan’s -“cash business was not much,” but his “total actual receipts ran about $150 a day, on installments [brought in by the collector],” and on Mondays and Saturdays as high as $250 and $500. Mr. Blogan was therefore a large depositor, entitled to some favors at the hands of his banker, and
 
 Webster lenew it,
 
 for Webster made up the deposit slips, taking the cash out of the drawer where it was put when the collecter came in with it.
 

 Blogan
 
 suspected
 
 Webster:
 

 “My suspicions were aroused to this extent that I knew there was some irregularity, and I tried in different ways to detect just where Mr. Webster was getting his money. * * * He looked after my deposit, he made up the deposit by himself, and so I thought probably he might be taking money out of the deposit as it went to the bank. So I got the Commercial National Bank’s private detective down there— I had taken the matter up with him for a suggestion—and asked him was there any way that I could detect it, and he suggested that, ‘if you will mark certain denomination bills, say, 5’s or 10’s or 20’s, with certain marks, probably we can detect it that way.’ He suggested that, because we thought, if he was taking anything out of my money, he had taken it when he made up the deposit slip, go we did that for, I guess, half a dozen times, and we failed to find any irregularities in the deposits.”
 

 Blogan found quite often that “credit had been given on the ledger for payments on installments which did not appear on the cash.
 
 But I never paid much attention about that.
 
 He always claimed it was an oversight.”
 

 Blogan tried as best he could to cheek up his own books, and either could not, or did not, find any irregularities. Webster knew that he was being cheeked up, because Blogan was doing this in his presence, and refused his assistance. “As I told you, while I was checking up his books, Mr. Webster showed some signs of nervousness, or seemed like he was opposed to my cheeking them up; seemed worried as to why I wanted to look into his books. * * * Naturally, if I was working for a man, and he began checking me up, or taking charge of the books, I would be worried a little over it. * * * It was perfectly natural that he should feel that way.” But there is nothing! in the evidence tending to show that Webster gave any other indications than as above that he feared the result of an investigation of his books. There is nothing to show that there was any effort or intention on the part of Blogan to put an expert on Webster’s books, and there is no evidence as to what such an investigation by an expert might have disclosed, for Blogan refused (as he had a right to do) to have his books examined after Webster’s- death. And there is some evidence, not very clear, and all hearsay, as to some goods having been delivered
 
 *895
 
 C. O. D. without being entered on the books, and of a check which turned up as payment on an account which seemed to'stand open. But all this developed
 
 after Webster’s death,
 
 and therefore has no direct bearing on his state of mind at the time of his death, whatever may be its worth otherwise.
 

 Finally, these investigations and attempts at detection began about 4- months before Webster died, but had openly ceased and been abandoned more than a month before he died. So that Webster, even if he were robbing his employer, was in no immediate danger-of detection, and any fear of discovery which he might have had at the time must have worn oft as time passed, and there is no indication whatever in the evidence that, at the time of his death, or during the time which immediately preceded it, Webster was laboring under any fear of his alleged peculations being discovered, and of his being called to account for them. Hence the record does not
 
 show
 
 that he had such a motive.
 

 XXI.
 

 As to
 
 remorse:
 
 That
 
 might
 
 drive a man to suicide, but we know of no instance in which it has actually done so. And the natural tendency'of a man affected by
 
 remorse
 
 would be rather to make restitution, if he could, and this record shows that Webster had the means of making restitution far beyond any possible amount which he could have stolen, even if every dollar which he put into the bank beyond his salary were charged up against him as a theft from his employer. But, at any rate, remorse
 
 might
 
 have suggested restitution rather than suicide, and hence it is not
 
 proved
 
 that Webster killed himself out of remorse for his alleged shortcomings.
 

 XXII.
 

 We have now about reached the last stage of our weary journey; ■ the windup of this tiresome recital of details, which “leap to the eye,” as it were, upon merely glancing through the record, but none the less take up much time in their rehearsal and orderly arrangement, which, when finished, will serve, beyond this particular case, no other purpose than to incumber our law reports, and maybe drive to desperation some unfortunate member of the bar who may attempt to wade through it. No other purpose, unless; perhaps, to point out the infinity of details which may enter into the examination and development [in writing] of a case of this kind, depending on circumstantial evidence only, and to
 
 emphasize
 
 the proposition with which we early started out, to wit, that
 
 each such case must necessarily stand on its own particular facts and circumstances.
 

 XXIII.
 

 We will therefore now take up and consider Webster’s bank account part of which had been furnished by the bank to Blogan, and had aroused or strengthened his suspicions, and the whole of which, for one year before Webster’s death, is now before us.
 

 But before doing so it is in order to say that Webster bought his new home on April 5, 1921, just 2 months before his death, for the price of $10,SO0, of which he paid in cash $5,000 at the time of the sale, and for the balance furnished three notes of $2,000, $2,000, and $1,800, payable respectively, in one, two, and three years, for this cash payment will serve to explain certain checks drawn against his account.
 

 (A) The account begins with a balance on May 31, 1920, one year and six days before his death, of $4,643.22. To this must be added 25 deposits,- made up of 52 separate items, aggregating altogether- $10,929.12; from this total of $15,572.34 must be deducted 91 checks, aggregating $14,945.64; thus leaving a balance, at the close of business on Saturday June 4, 1921, the day before his death, of $626.70.
 

 
 *897
 
 There is no
 
 evidence
 
 in this record that Webster came by the balance of $4,643.22 of May 31, 1920, otherwise than honestly, though, of course, it might be reasonable to argue that, if he were systematically robbing his employer in 1920-1921, he must have been doing the same before, and Webster is not here to tell where that balance came from; but Mrs. Webster says: “We saved our money,” and that may account for some of it. There is alsc^ a suggestion (but no proof) that Webster had some money “that he got from his father and mother,” and Mr. Blogan “knew that he was interested in a little piece of land down here”; but it is not shown what the value of that land might be, and whether he sold it, or, if so, when. This balance, therefore, of itself shows nothing.
 

 (B) We have said that Webster made 25 deposits, in 12 months, an average of two each month, consisting of 52 separate items. These 52 items consist of 12 salary checks, aggregating $2,650; of 17 other cheeks, aggregating $5,522.12, being one for $4,121.20, one for $629.45, one for $147.18, and 14 of less than $100 each, adding up $624.29; and of 23 cash items running from $30 to $225, aggregating $2,757 (including $65 in gold and silver coin).
 

 The check of $4,121.20 is the amount of a savings account transferred to his checking account to make up the sum needed for the cash payment on the home he purchased April 5, 1921; being $4,000, with 4 per cent, interest for 9 months, to wit, from July 2, 1920 to April 1, 1921. The two checks of $629.45 and $147.18, and the 14 checks adding up $624.29, aggregating $1,400.92 for the 16 cheeks, may or may not have represented business transactions, but it is not conceivable that the 16 cheeks were payable to Blogan and passed through Blogan’s bank without attracting the attention of the bank, or of Blogan himself, who had been furnished by the bank with a copy of Webster’s account. Nor does Webster’s account show the deposit of a single cheek for an even $100, which was the amount of the check supposed to have been paid on an account which still stood open, of which we made mention in paragraph XX.
 

 The 23 items of cash deposited, running from $30 to $225, may or may not have represented business transactions (and by business transactions we mean partial payments on automobiles sold, and the return of the “little accommodation loans” of which Mr. Blogan spoke); but Mr. Blogan tried “half a dozen times” to find in these cash deposits the marked bills which he had put into his cash drawer, and failed to find them; so that we fail to discover on the
 
 deposit
 
 side of Webster’s account anything that even approaches proof that he was robbing his employer. True, the $2,757 in cash, and $1,400.92 in checks, deposited by him, are not explained; but Webster is not here to explain them, and we know of no. rule in law or in reason which would permit us to assume that he could not do so, and therefore that he stole.
 

 (O) The 91 checks drawn against the account, aggregating $14,945.64, consist of 2 checks adding $5,000 (to wit, $4,500 and $500); 1 check* of $4,000 ; 4 checks adding $2,635.15 (to wit, $1,132, $882, $416.25, and $204.90); 1 check of $187.75; 6 checks adding $782.23 (to wit, $181, $132.70, $132.29, $115.-24, $115, $106); 38 checks adding $1,041.50 (running in odd amounts from $25 to $89); 3 checks adding $300 (to wit, $100 each); and 36 checks adding even $1,000 (running from $5 to $65, in multiples of $5).
 

 Of course, it must be remembered that we have not these checks before us, but only the account called for and furnished by the bank, and hence must be guided only by dates and amounts, as far as they may suffice.
 

 Thus guided, we find that the 2 cheeks
 
 *899
 
 adding $5,000 were given for the cash portion of the purchase price of the home bought on April 5th; that the $4,000 check was a transfer from his checking account into a savings account on July 2, 1920 (withdrawn with interest on April 1,1921, to make up the cash payment just mentioned); that the cheek of $187.75, charged off on June 26, 1920, was the premium on the policy herein sued upon (applied for on June 11, 1920, issued at. New íork on June 16th).
 

 Eor the rest we have no guide except the amount of the checks. The 4 checks adding $2,635.15 seem to indicate business transactions of some sort. The 6 cheeks adding $782.23 may or may not have been given in business transactions. The 38 checks adding $1,040.51 may represent either business transactions or personal expenses, or partly both. The 3 checks of $100 each, and the 36 checks, adding even $1,000, were probably cashed over the counter. We do not know what became of the proceeds of any of these checks.
 

 (D) Accordingly, if we eliminate the $4,000 which Webster first transferred to his savings account, and then brought back into his checking account, we find that Webster handled exactly $10,945.64 in the year, as follows:
 

 (1)He drew against his old balance in bank
 
 of the year before
 
 exactly $4,016.52 (being the amount by which he reduced the balance of May 31, 1920, amounting to $4,643.-22, to a balance of $626.70 on June 24, 1921); to this should be added 12 salary checks, amounting to $2,650, and also $121.20 of interest earned on his savings account (to wit, $4,121.20 less $4,000), making $6,787.72, for which we can account absolutely. In addition thereto he received 16 checks aggregating $1,400.92 (to wit, $629.45, $147.18, and $624.29), which 16 checks
 
 were almost certainly
 
 not payable to Blogan, but to himself; and he received (or took) in cash, $2,757, none of which could be
 
 identified
 
 as money taken from
 
 Blogan.
 
 This sum of $4,157.92 (to wit, $i,400.92, plus $2,757) when added to the $6,787.72 above mentioned, makes up the $10,945.64 which pássed through his hands in the year.
 

 (2) His disbursements were as follows: $5,000 cash paid on account of the Home he purchased, and $187.75 for the premium on the policy herein sued upon; .making $5,187.-75 for which we can account absolutely. He paid out $2,635.15 by 4 large checks; $782.-23 by 6 checks, each for more than $100, but less than $200; also $1,040.51 by 38 checks of less than $100 each; and he cashed over the counter 36 checks, aggregating $1,300. These $5,757.89, added to the $5,187.75 above' mentioned, make up the sum total of $10,945.64 Which passed through his hands as aforesaid.
 

 (3) Out of the $5,757.89 above mentioned, Webster paid his ordinary living expenses, whatever they may have amounted to, for his whole salary went into his bank account as aforesaid, and the balance either represents business .transactions of some sort or was squandered in high living or dissipation. But there is no evidence in this record showing that he lived high or dissipated; the evidence, so far as- it goes, showing the* contrary. And there is evidence tending to show that he did engage in some business transactions, to wit, occasionally buying and reselling automobiles and making some small loans, and this is to some extent corroborated by the fact that he received 16
 
 checks
 
 aggregating $1,400.92, one of them for a fairly large sum-—$629.45.
 

 (4) So that an analysis of Webster’s hank account would not warrant, merely because of the large total amount that came and went through it, our concluding with anything like reasonable certainty (if it could be said to warrant such conclusion at all) that Webster was robbing his employer.
 
 *901
 
 And, if he was not doing so, it was nobody’s concern whence he received, and how he disposed of, his own -money.
 

 XXIV.
 

 Our conclusion is: (1) That the evidence does not show with anything like legal certainty, or show at all, that Webster was robbing his employer Blogan; (2) that, even if it did,’ it still does not show that Webster was in any immediate apprehension of discovery; (3) that, even if he had been under such apprehension about the time of his death, nevertheless his condition at the actual time thereof, and the suddenness with which it happened, show that such apprehension could not have been operating on his mind at that time; and (4) that the physical circumstances surrounding his death do not exclude the possibility of its having been the result of an
 
 accident.
 

 The presumption against suicide must therefore prevail for lack of evidence that the deceased was actuated at the time by any sufficient motive to take his own life.
 

 The judgment below will therefore be reversed, and a judgment entered for plaintiff as prayed for.
 

 Decree.
 

 The judgment appealed from is therefore reversed; and it is now ordered that plaintiff, Mrs. Gail B-. Webster, do have and recover of defendant, New York Life Insurance Company, the full sum of $10,000, with legal interest from August 5, 1921, until paid, and costs of both courts.